RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0093p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LINDA RICHKO, as Personal Representative of the
Estate of Jeffrey Horvath,

>*Plaintiff-Appellee*,

*v.*

No. 15-1524

WAYNE COUNTY, MICHIGAN; APRIL WILLIAMS;
LARRY CAMERON; ANDRE STINSON,

>*Defendants-Appellants*.

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:12-cv-11232—Denise Page Hood, Chief District Judge.

Argued: March 9, 2016

Decided and Filed: April 15, 2016

Before: CLAY, GILMAN, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Aaron C. Thomas, WAYNE COUNTY, Detroit, Michigan, for Appellants. Steven F. Fishman, Detroit, Michigan, for Appellee. **ON BRIEF:** Aaron C. Thomas, WAYNE COUNTY, Detroit, Michigan, for Appellants. A. Vince Colella, Southfield, Michigan , for Appellee.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. Jeffrey Horvath died on September 21, 2011 after being beaten and stabbed by cellmate Brandon Gillespie inside the mental-health ward of Michigan's Wayne County Jail. Linda Richko, as the personal representative of Horvath's

1

estate, filed this lawsuit under 42 U.S.C. §§ 1983, 1985, 1986, and 1988. She alleged that Wayne County and jail personnel Larry Cameron, Andre Stinson, and April Williams were deliberately indifferent to Horvath's safety, in violation of his Fourth, Eighth, and Fourteenth Amendment rights. Specifically, Richko alleged that the defendants knew or should have known that Gillespie's dangerous and violent propensities presented a substantial risk of serious harm to Horvath, but disregarded that risk by (1) allowing Gillespie to be placed in Horvath's cell, and (2) failing to adequately respond to the ensuing assault.

The district court denied summary judgment to all of the defendants, concluding that a genuine dispute existed regarding whether Wayne County and the individual defendants violated Horvath's constitutional rights by disregarding a substantial risk of serious harm to Horvath. The individual defendants have filed this interlocutory appeal on the basis of qualified immunity. Wayne County has also appealed, asserting pendent jurisdiction. For the reasons set forth below, we **AFFIRM** the judgment of the district court with regard to the individual defendants and **DISMISS** Wayne County's interlocutory appeal for lack of jurisdiction.

## I. BACKGROUND

### A. Assault on Horvath

On September 13, 2011, the police in Dearborn, Michigan arrested Horvath based on an outstanding warrant for a nonviolent misdemeanor. Horvath was later booked at the Wayne County Jail. Officials noted that Horvath had undergone prior mental-health treatment and accordingly placed him in "4SW," the jail's mental-health unit. Unable to post bail, Horvath remained in 4SW for eight days.

On the evening of September 20, Horvath requested that he be moved out of his original cell due to a malfunctioning toilet. He was then placed in cell 14 of 4SW. A short time later, Gillespie was placed in the same cell. The two spent the night in cell 14 without apparent incident.

On the morning of September 21, approximately an hour before the attack took place, Horvath was scheduled for an x-ray examination. Deputy Stinson, who was manning the ward's

duty station, said that at approximately 7:40 a.m., he "flick[ed] the lights" on and off in cell 14 to get Horvath's attention. He then "yell[ed] through the sally port slot" of the duty station to summon Horvath from his cell. After Stinson remotely opened the cell door, Horvath stepped to the "outside of [the] duty station in front of the . . . wire window." Stinson later stated that, upon exiting the cell, Horvath "was outside in the hallway" and "off the ward completely."

When Stinson informed Horvath that it was time for his x-ray, Horvath protested. He asked if the x-ray was really necessary, noting that he anticipated "getting out tomorrow." Stinson then called down to the medical unit and learned that Horvath's protest was moot because the x-ray had in fact been cancelled. Notably, during this conversation with Stinson, Horvath expressed no concerns about being housed with Gillespie. Stinson then directed Horvath to return to cell 14 at approximately 7:44 a.m.

That same morning, Gillespie began experiencing auditory hallucinations. He said that voices were "having sex, yelling at [him], [and] trying to make deals with [him]," which caused him to become aroused. Sometime between 8:34 a.m. and 9 a.m., the Complaint alleges that, as a result of these hallucinations, Gillespie assaulted Horvath "by punching him in the head and face several times, delivering blows to his face with his foot and knee, stabbing him multiple times in the face with a pencil, and sodomizing him either pre- or post-mortem, causing serious injuries resulting in his death." Gillespie later told investigators that he was angered by Horvath, whom he believed "was trying to be gay."

Several inmates housed in 4SW during this time reported hearing a series of loud "thumps" coming from Horvath's cell and seeing water flowing out of the cell into the ward. Due to the fact that solid walls separate one cell from the next, they were unable to see into Horvath's cell. One inmate heard banging and a voice yelling: "Let me out. Let me out." Another inmate grew concerned about the banging and called out to Horvath to ask if he was okay. Gillespie shouted back: "Stay out of this or I'll [f***ing] kill you."

Nurse April Williams, who had been administering medication to inmates in 4SW during this time, arrived at cell 14 at approximately 8:50 a.m. and found Gillespie standing at the bars with his genitals exposed. According to Williams's deposition, Gillespie made lewd comments

and asked her if his penis was "infected." Williams saw no sign of Horvath in the cell. She then notified Stinson, again at approximately 8:50 a.m., that she had been unable to locate Horvath.

At approximately 9:00 a.m., Stinson called another officer to assist him so that he could enter the ward. Stinson's deposition does not explain the ten-minute delay in responding to Williams's notification that Horvath was missing. When he entered the ward, Stinson found Gillespie standing at the front of cell 14. He also noticed water on the floor of the cell, a blanket shoved into the toilet, and two mattresses stacked on top of each other. Stinson entered the cell and found Horvath's body sandwiched between the mattresses. According to the Complaint, Horvath was "hemorrhaging blood between the scalp and skull into both jaws," and his "eyes were bloody and swollen, with multiple puncture wounds around the eyes, the bridge of the nose, and his lip pushing into his teeth." Stinson called for another guard in the duty station to sound a medical alert. Williams, who was either standing outside the ward or in a meeting, then reentered the ward with another nurse and began administering CPR. Efforts to resuscitate Horvath were unsuccessful, and he was declared dead at 9:29 a.m.

**B.      Gillespie's intake and medical examinations**

On September 19, 2011, Gillespie was arrested for felonious assault after allegedly threatening a bus driver with a knife. He was brought to the Wayne County Jail, where he underwent several screening interviews over the course of the night and the following day. Because Gillespie had not been previously housed in the Jail, there were no internal records regarding his mental-health history. But, as discussed below, Gillespie did report to the medical staff that he had both bipolar disorder and schizophrenia, and that he had not taken his prescribed medications for six days.

Gillespie was first booked by Matthew Mears, who logged Gillespie's basic information into the Jail's Inmate Management System. He was then examined by medical assistant Dawn Benette to determine whether he posed a risk to himself or others. Benette documented the examination by completing an "intake form" in which she asked Gillespie to describe his past medical history. Gillespie self-reported that he was being treated for bipolar disorder and

schizophrenia.  He denied any drug use.  Benette noted that Gillespie was "acting very strange" and referred him to the mental-health department for further screening.

Gillespie was next examined by registered nurse Renella Thomas in the early hours of September 20.  Thomas observed that Gillespie appeared clean, cooperative, and neat, and that his mood was stable. Like Benette, Thomas asked Gillespie to self-report his mental state.  He denied having any homicidal or suicidal thoughts or hallucinations.  Gillespie also said that he had been prescribed medication for his bipolar disorder and schizophrenia but did not have any with him.  Although she was aware that Gillespie was not taking his medications, Thomas failed to request that Gillespie be prescribed anything for his conditions.  Thomas concluded that Gillespie was not a danger to himself, but she nevertheless recommended that Gillespie be given a mental-status examination (MSE) at some point.  She concluded that Gillespie could be housed in the jail's general population until the MSE.

At approximately 6:30 p.m. on September 20, social worker Larry Cameron performed the requested MSE on Gillespie.  As part of this examination, Cameron searched the Wayne County Mental Health Wellness Information Network (MH-WIN).  Richko characterized the MH-WIN system as a compilation of "mental health treatment records maintained by providers within Wayne County," with access to the MH-WIN system "provided to all Qualified Health Professionals conducting a mental status exam at the jail."  Cameron discovered that Gillespie, who was 22 years old, had 2,334 mental-health "encounters" logged into the MH-WIN system over an 11-year period.  But because Jail policy did not require it, Cameron failed to conduct any further investigation to determine what those encounters actually were.

During the MSE, Gillespie told Cameron that he had been hospitalized six times as a result of hearing voices.  He also stated that he had not taken his anti-psychotic medications for six days.  Despite these disclosures, Cameron made no attempt to access the records of Gillespie's past hospitalizations in the MH-WIN system.  He did, however, note on the MSE form that Gillespie had "psychosocial and environmental problems" and "poor insight into his mental illness."  Nevertheless, Cameron did not recommend that Gillespie be housed alone in a single cell.

**C.     Procedural history**

Richko originally brought claims against the Wayne County Sheriff's Department, Wayne County, and a number of jail personnel under 42 U.S.C. § 1983, claiming that the individual defendants were deliberately indifferent to Horvath's need for protection from violent attacks by inmates, and that the individual defendants' deliberate indifference resulted from the deficient policies, training, and supervision on the part of the entity defendants. *Richko v. Wayne Cty. Sheriff's Dep't*, No. 12-CV-11232, 2015 WL 1498162, at *1-2 (E.D. Mich. Mar. 31, 2015). In addition to her § 1983 claims, Richko sought damages against the individual defendants for wrongful death, conscious pain and suffering, and physical injuries under 42 U.S.C. §§ 1985, 1986, and 1988. *Id.*

All of the defendants moved for summary judgment, arguing that the individual defendants were entitled to qualified immunity and that Richko's theory of municipal liability was untenable. The parties filed a stipulated order in May 2014 in which they dismissed the Sheriff's Department and several of the jail personnel, leaving only Cameron, Stinson, Williams, and Wayne County as the remaining defendants in this action.

In March 2015, the district court denied summary judgment for the remaining defendants. *Richko*, 2015 WL 1498162, at *7. Regarding municipal liability, the district court found that Wayne County "had a de facto policy of not requiring a review of readily-available prior mental health records, including the MH-WIN records." *Id.* at *5. It concluded that this failure to review Gillespie's mental-health records after being put on notice that he had a significant mental-health history, coupled with Gillespie's subsequent placement into Horvath's cell without further investigation, "may be considered a reckless disregard of the risk of harm" to Horvath sufficient to show deliberate indifference. *Id.* The district court also held that Cameron, Stinson, and Williams were not entitled to summary judgment on the basis of qualified immunity, concluding that "there is a genuine issue of material fact as to whether Defendants violated Horvath's constitutional rights by recklessly disregarding the excessive risk of harm to Horvath." *Id.* at *7. The defendants have timely appealed.

## II. ANALYSIS

### A.      Standard of review

"We review de novo a district court's denial of a defendant's motion for summary judgment on qualified immunity grounds." *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 565 (6th Cir. 2013).  Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  But summary judgment is not proper if, after reviewing all facts and drawing all reasonable inferences in favor of the nonmoving party, a reasonable jury could return a verdict for the nonmoving party.  *See Stoudemire*, 705 F.3d at 565.

A municipality, unlike the individual defendants, is not permitted to raise qualified immunity as a defense and thus may not normally appeal the district court's denial of summary judgment.  *Meals v. City of Memphis, Tenn.*, 493 F.3d 720, 727 (6th Cir. 2007).  This court, however, may exercise pendent jurisdiction over municipal liability to the extent that issues raised by the municipality on appeal are "inextricably intertwined" with the qualified-immunity analysis.  *Mattox v. City of Forest Park,* 183 F.3d 515, 523–24 (6th Cir. 1999) (internal quotation marks omitted).

The defendants raise a number of issues on appeal, ranging from discrete legal questions to disputed issues of fact.  We will first address the arguments raised by the individual defendants Cameron, Stinson, and Williams, and will then discuss the jurisdictional issue regarding Wayne County.

### B.      Deliberate-indifference claims regarding Cameron, Stinson, and Williams

The individual defendants argue that the district court failed to apply the correct legal standard regarding Richko's deliberate-indifference claim.  Because this argument presents a purely legal issue, we have jurisdiction to consider it.  *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

The doctrine of qualified immunity shields government officials from civil liability under § 1983 if "their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To determine whether an officer is entitled to qualified immunity, a court evaluates two independent prongs: whether the officer's conduct violated a constitutional right, and whether that right was clearly established at the time of the incident. *Id*. at 232. These prongs may be addressed in any order. *Id*. at 236.

The constitutional right at issue in this case—Horvath's right to be free from violence at the hands of other inmates—was clearly established by the Supreme Court in *Farmer v. Brennan*, 511 U.S. 825 (1994). *Farmer* held that "prison officials have a duty to protect prisoners from violence at the hands of other prisoners" because corrections officers have "stripped them of virtually every means of self-protection and foreclosed their access to outside aid." *Id*. at 833 (ellipsis and internal quotation marks omitted); *see also Wilson v. Yaklich*, 148 F.3d 596, 600 (6th Cir. 1998) ("Without question, prison officials have an affirmative duty to protect inmates from violence perpetrated by other prisoners.").

We begin by clarifying the specific source of the constitutional right to be free from inmate-on-inmate violence. In denying the defendants' motion for summary judgment, the district court appears to have based its holding solely on the Eighth Amendment right to be free from cruel and unusual punishment. *Richko*, 2015 WL 1498162, *4-6. But the Eighth Amendment applies only to those individuals who have been tried, convicted, and sentenced. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985). Pretrial detainees like Horvath, on the other hand, are protected by the Fourteenth Amendment's Due Process Clause. *See Roberts*, 773 F.2d at 723. But such a misstatement by the district court is inconsequential because this court has made clear that, under the Fourteenth Amendment, pretrial detainees are "entitled to the same Eighth Amendment rights as other inmates." *Thompson v. Cty. of Medina, Ohio*, 29 F.3d 238, 242 (6th Cir. 1994). The analysis set forth in *Farmer*, although rooted in the Eighth Amendment, therefore applies with equal force to a pretrial detainee's Fourteenth Amendment claims. *Ruiz-Bueno v. Scott*, Nos. 14-4149, 14-

4151, 2016 WL 385294, at *4 (6th Cir. Feb. 2, 2016) (noting that "Supreme Court precedents governing prisoners' Eighth Amendment rights also govern the Fourteenth Amendment rights of pretrial detainees").

Applying the above analysis to the present case, Richko had the burden of presenting evidence from which a reasonable juror could conclude that the individual defendants were deliberately indifferent to a substantial risk of serious harm to Horvath and that they disregarded that risk by failing to take reasonable measures to protect him. *See Farmer*, 511 U.S. at 842. Under this rubric, Richko must satisfy both an objective and a subjective component. *Id.* at 835-38. She can satisfy the objective component by showing that, "absent reasonable precautions, an inmate is exposed to a substantial risk of serious harm." *Amick v. Ohio Dep't of Rehab. & Corr.*, 521 F. App'x 354, 361 (6th Cir. 2013) (citing *Farmer*, 511 U.S. at 836). The subjective component requires Richko to show that (1) "the official being sued subjectively perceived facts from which to infer a substantial risk to the prisoner," (2) the official "did in fact draw the inference," and (3) the official "then disregarded that risk." *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014) (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)). "Because government officials do not readily admit the subjective component of this test, it may be demonstrated in the usual ways, including inference from circumstantial evidence . . . ." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009) (brackets, citation, and internal quotation marks omitted).

### 1. *Richko has satisfied* **Farmer***'s objective prong*

The individual defendants argue that Richko failed to present evidence of their culpability under *Farmer*'s objective and subjective prongs. They first contend that there was no objective evidence in the record showing that Gillespie posed a risk of harm to anyone. But such a statement is belied by the record. All that Richko needs to show is that Horvath was "incarcerated under conditions posing a substantial risk of serious harm." *Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001) (quoting *Farmer*, 511 U.S. at 834).

We analyze the objective component "in the abstract." *Clark-Murphy v. Foreback*, 439 F.3d 280, 286-87 (6th Cir. 2006) (noting that "the deprivation of water and medical care,

including psychological services, of course would be 'sufficiently serious' to satisfy [*Farmer*'s objective] requirement"); *see also Williams v. McLemore*, 247 F. App'x 1, *9 (6th Cir. 2007) ("In the abstract, one prison inmate's threat to the health and safety of another inmate is 'sufficiently serious' to satisfy [the objective] requirement.").

Viewing the present case in the abstract, the risk to Horvath of being housed with and attacked by an inmate who had recently been arrested for violent assault and had a history of serious mental illness was sufficient to fulfill the objective component of this analysis. Because the analysis of the facts below establishes, for the purpose of overcoming the defendants' motion for summary judgment, that Richko has satisfied the subjective component of *Farmer*'s test, the objective component is likewise satisfied based on the same factual analysis.

The individual defendants next argue that the district court failed to apply the subjective component of a deliberate-indifference claim to each of them. In *Garretson v. City of Madison Heights*, 407 F.3d 789 (6th Cir. 2005), the court held that "[t]his subjective component [of a deliberate-indifference claim] must be addressed for each officer individually." *Id*. at 797. This holding was further discussed in *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531 (6th Cir. 2008), where the court held that "general allegations" of liability, so long as they are not "broad and conclusory accusations," can provide "sufficient evidence from which a trier of fact could infer that each individual correctional officer had an objective awareness as to the seriousness" of the risk, "and that their failure to do anything . . . amounted to deliberate indifference." *Id*. at 542. Utilizing *Phillips*'s guidance, therefore, we next consider whether the facts construed in the light most favorable to Richko show that Cameron, Stinson, and Williams had the requisite level of culpability to satisfy *Farmer*'s subjective component.

### 2. *Social worker Larry Cameron*

#### a. *Richko's factual allegations about Cameron's ability to access information in the MH-WIN system are not blatantly contradicted by the record*

Because Cameron appeals from the denial of summary judgment, he must concede the version of the facts most favorable to Richko. *See Johnson v. Jones*, 515 U.S. 304, 319-20 (1995). But Cameron contends that Richko made "blatantly and demonstrably false"

misrepresentations regarding material facts that, in view of *Scott v. Harris*, 550 U.S. 372 (2007), should not be considered for the purpose of summary judgment. *See id.* at 380 (noting that a version of the material facts that "is blatantly contradicted by the record" should not be credited).

Cameron specifically argues that Richko misrepresented to the district court that Cameron could have accessed Gillespie's specific treatment information in the MH-WIN system. Richko alleged that Cameron "admit[ted] that if he had examined the MH-WIN encounters, he could have determined the extent of Gillespie's former treatments, diagnoses, and outpatient care." But Cameron maintains that the deposition shows only that he "did not consult any other information in the MHWIN system, because he did not need to do so in order to complete the mental status examination."

The specific deposition testimony at issue is as follows:

ATTORNEY: Based on your understanding of the MH-WIN System, are you able to access previous treatment information about a consumer?
CAMERON: No previous treatment information.

. . .

ATTORNEY: Are you able to access information regarding diagnosis?
CAMERON: Yes.
ATTORNEY: And are you able to access information regarding risk assessment?
CAMERON: No.
ATTORNEY: Are you able to access information regarding any service, mental health service that a consumer received?
CAMERON: Yes.

. . .

ATTORNEY: Once you took the mental status examination and Mr. Gillespie had indicated to you that he was diagnosed bipolar, were you able to confirm that through the MH-WIN System?
CAMERON: Yeah, I did not access that information at the time.

ATTORNEY: Okay. So you did not confirm through the MH-WIN System Mr. Gillespie's indication to you that he was previously diagnosed as bipolar?
CAMERON: No.

. . .

ATTORNEY: If [Gillespie] was diagnosed as being schizophrenic would that be something that you could have accessed in the MH-WIN System?
CAMERON: Yes. By code, yes.

ATTORNEY: Are you familiar with the code for pycho-schizophrenia?
CAMERON:   Yes, I am.

This deposition testimony does not "blatantly contradict[]" or "utterly discredit[]" Richko's allegations. *See Scott*, 550 U.S. at 380. Richko's argument is based on Cameron's own admission that he was able to access previous diagnoses and prior mental-health and substance-abuse services by a corresponding code. Cameron also stated that he never attempted to use the "incident" portion of the MH-WIN system, thereby raising a factual question of whether he was unable to access incident reports or simply chose not to do so. And although Cameron testified that he could not access detailed treatment information, Richko notes that Cameron explicitly conceded that he could access, among other things, Gillespie's prior diagnoses, mental-health services, and substance-abuse services—and possibly incident reports.

Richko also presented evidence in the form of a MH-WIN chart, which suggests that Cameron could access at least *some* treatment information in the MH-WIN system. The MH-WIN chart lists a series of "encounters" by date, and includes links to "view," "print claim," and "view full detail." Based on this information, a factfinder could reasonably infer that Cameron could have further investigated the "full detail" of Gillespie's mental-health issues in the MH-WIN system to determine whether he posed a substantial risk to other inmates and thus should have been recommended for single-cell placement.

> **b. A reasonable juror could find that Cameron was deliberately indifferent to a substantial risk of harm to Horvath because he was aware of Gillespie's significant mental history, failed to investigate it further, and failed to recommend that Gillespie be housed alone**

Cameron next argues that, even if his decision not to house Gillespie alone led to the attack, it does not prove that Cameron had the requisite mental state to establish deliberate indifference. But Richko need not show that Cameron acted with the "very purpose of causing harm or with knowledge that harm will result." *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Liability can instead be established simply by showing that the correctional officer "refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Id.* at 843 n.8.

That is precisely the issue here.  The record includes facts that, when viewed in the light most favorable to Richko, reveal that Cameron (1) was aware of Gillespie's self-reported history of bipolar disorder and schizophrenia, (2) was aware that Gillespie had not taken his medication for these conditions for six days, (3) knew that Gillespie had been arrested the day before for attempted assault with a dangerous weapon, (4) knew that Gillespie had been hospitalized six times for his mental illnesses, and (5) discovered through the MH-WIN system that Gillespie had 2,334 prior encounters with mental-health services and/or providers over the past 11 years (equating to approximately 212 encounters per year since he was 11 years old).

So even if one assumes for the sake of argument that Cameron could not have accessed information regarding individual incidents in the MH-WIN system, a reasonable juror could nevertheless conclude that the information that *was* available to Cameron was enough to show that Cameron was aware that Gillespie posed a substantial risk of violence to others and that Cameron was deliberately indifferent to that risk.  The district court therefore properly denied Cameron's motion for summary judgment based on his claim of qualified immunity.

### 3.  *Deputy Sheriff Andre Stinson*

We confront a closer question in determining whether the district court properly denied summary judgment to Deputy Sheriff Stinson.  Unlike Nurse Williams, Stinson was not physically inside ward 4SW during the time of the assault; he was instead manning the ward's duty station.  In addition, Stinson testified that he did not know that Horvath was sharing a cell with another inmate at the time.  The dispositive inquiry regarding Stinson is therefore whether Richko presented sufficient evidence for a reasonable juror to conclude that (1) Stinson heard the thumps, shouts, and banging coming from cell 14 while he was inside the duty station, and that he simply chose not to respond; and (2) Stinson failed to promptly respond to the incident once Williams informed him that Horvath was missing.

Stinson points to several facts that would tend to show that he was not on notice of a serious altercation, and therefore could not have actual knowledge that Gillespie posed a substantial risk of serious harm to Horvath.  For one, Stinson notes that he had a conversation with Horvath that same morning, and that Horvath never mentioned feeling uncomfortable or

unsafe in his cell with Gillespie. Moreover, Stinson noted that two other officers performed separate "walk-throughs" of the ward that morning, at 8:07 a.m. and 8:30 a.m., respectively, and neither found any evidence of suspicious behavior.

But this evidence is irrelevant to our present analysis. The key issue here is instead whether, during the relevant time period beginning at 8:34 a.m., there is any evidence showing that Stinson heard the assault taking place and chose not to respond. We need not consider what information Stinson had before the time of the attack, but whether, once the attack began, Stinson perceived a risk of harm to Horvath and chose to disregard that risk.

Stinson certainly raises doubts as to what he could hear and see at the time of the attack. He disputes Richko's contention that he heard the assault from the duty station, pointing to the fact that, in order to speak with Horvath earlier that morning, he had to bring Horvath out of his cell into the hallway and "off the ward completely." And he also disputes Richko's claim that there was a 10-minute gap between the time he was notified by Williams and the time he went inside the ward to locate Horvath. But all of these arguments are disputes of fact and not of law. They are therefore outside our jurisdictional purview for purposes of this appeal. *See Johnson v. Jones*, 515 U.S. 304, 317 (1995) (limiting interlocutory appeals of qualified immunity to cases presenting "neat abstract issues of law" and not to factual controversies (citation omitted)).

Indeed, Stinson might very well prevail in proving that he did not hear the attack, and thus that he could not have deliberately disregarded the risk that Gillespie posed to Horvath. But such arguments are appropriately reserved for a jury, not for this court at the summary-judgment stage of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (noting that the district court, at the summary-judgment stage, is tasked with determining "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" (citation and internal quotation marks omitted)); *see also Elliott v. Thomas*, 937 F.2d 338, 341 (7th Cir. 1991) ("[W]hether the defendants did the deeds alleged . . . is *precisely* the question for trial." (emphasis in original)).

Here, Richko proffered enough evidence for a reasonable juror to conclude that Stinson *did* have knowledge of the risk to Horvath and that he deliberately disregarded that risk. First,

she presented evidence indicating that sounds, and especially loud ones, can be heard from the duty station.  Deputy Sheriff Jeremy Meinke testified that "you can hear a good amount" from the duty station, and that "it gets loud" when inmates play cards or watch TV.  This evidence is bolstered by the fact that Stinson himself noted that he "may be able to hear some noise" from the duty station.

Construing the facts in the light most favorable to Richko, a reasonable juror could infer that Stinson heard the banging, yelling, and pounding from the duty station, that he simply chose not to respond, and that he further delayed responding for 10 minutes even after being notified by Nurse Williams that Horvath was missing.  All of Stinson's arguments are thus best left to a jury, which will be tasked with weighing the evidence presented by Stinson against that proffered by Richko.  We therefore conclude that the district court properly denied Stinson's motion for summary judgment that was based on his claim of qualified immunity.

### 4.  *Nurse April Williams*

For similar reasons, the district court properly decided that factual issues precluded the grant of qualified immunity to Nurse Williams.  She contends that she did not see or hear "loud talking," "fighting," or anything out of the ordinary when she was making her rounds, and therefore could not have been aware of any substantial risk of harm to Horvath.  But Richko presented testimony from three inmates stating the opposite:  (1) that there were five or six thumps coming from Horvath's cell during the time that Williams was in the ward; (2) that Williams stepped around water that was overflowing from Horvath's cell into the ward; (3) that there was banging coming from Horvath's cell and an individual repeatedly yelling "Let me out. Let me out"; and (4) that Gillespie verbally threatened to kill an inmate who called out to Horvath.

Faced with this competing circumstantial evidence, a jury could reasonably infer that Williams did in fact hear Gillespie's assault on Horvath and elected not to respond.  *See Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009) (noting that circumstantial evidence is important in a deliberate-indifference analysis because "government officials do not

readily admit" culpability).  The district court therefore properly denied Williams's motion for summary judgment based on her claim of qualified immunity.

**D.      This court does not have interlocutory jurisdiction over Wayne County's appeal**

We finally turn to Richko's claim against Wayne County as a municipal defendant.  The district court determined that there remained "a genuine issue of material fact as to whether Defendant Wayne County had a policy that constituted indifference to inmate safety." *Richko v. Wayne Cty. Sheriff's Dep't*, No. 12-CV-11232, 2015 WL 1498162, at *5 (E.D. Mich. Mar. 31, 2015).  In particular, it found that Wayne County's "de facto policy of not requiring a review" of an individual's mental-health records during a MSE, coupled with the placement of that individual inside a cell with another inmate without further investigation, "may be considered a reckless disregard of the risk of harm to the other inmate, which is sufficient to satisfy the deliberate indifference standard." *Id.*

Wayne County argues that the district court erred in denying the County's motion for summary judgment because the individual defendants did not violate Horvath's constitutional rights.  In other words, Wayne County contends that, because the individual defendants are not liable, it cannot be held liable.  The County's argument is not only unsound, *see Garner v. Memphis Police Dep't*, 8 F.3d 358, 365 (6th Cir. 1993) (holding that "a municipality may not escape liability for a § 1983 violation merely because the officer who committed the violation is entitled to qualified immunity"), but is irrelevant in light of our conclusion that the liability of the individual defendants is an issue for the jury.

"A [municipality] is not entitled to claim qualified immunity, and thus may not normally appeal the district court's denial of summary judgment as to it." *Meals v. City of Memphis, Tenn.*, 493 F.3d 720, 727 (6th Cir. 2007) (citation omitted).  Under the collateral-order doctrine, "only decisions that are conclusive, that resolve important questions separate from the underlying merits, and that are effectively unreviewable on appeal from the final judgment" may be appealed immediately.  *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 42 (1995) (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)).  Wayne County's interlocutory appeal fails *Cohen*'s third requirement.  Whether its policy of not requiring the

review of mental-health records in the MH-WIN database amounts to deliberate indifference is an issue that is reviewable on appeal after the district court renders a final judgment. *See id.* at 43 ("An erroneous ruling on liability may be reviewed effectively on appeal from final judgment.").

Pendent appellate jurisdiction over Wayne County's appeal is likewise inappropriate. A court may exercise pendent appellate jurisdiction over only those decisions that are "inextricably intertwined with" or "necessary to ensure meaningful review of" qualified-immunity claims. *Id.* at 51 (noting that pendent jurisdiction is proper "[o]nly where essential to the resolution of properly appealed collateral orders" (citation and internal quotation marks omitted)); *see also Brennan v. Twp. of Northville*, 78 F.3d 1152, 1158 (6th Cir. 1996) (defining "inextricably intertwined" as "coterminous with, or subsumed in, the claim before the court on interlocutory appeal" (citation and internal quotation marks omitted)).

Richko's claims against Stinson and Williams are plainly independent of and in no way implicate Wayne County's mental-health screening policy. And although it may overlap, the resolution of Richko's municipal-liability claim against Wayne County is not "essential to" the question of Cameron's immunity from suit because Richko's claim against Cameron is based on far more than Cameron's review of Gillespie's mental-health records. *See Swint*, 514 U.S. at 51. The "far more" consists of proof that Cameron was aware of a host of other factors indicating that Gillespie posed a substantial risk of serious harm to a fellow inmate. These factors included Gillespie's self-report of having bipolar disorder and schizophrenia, his statements that he had been hospitalized six times and that he had not taken his medication in six days, and—perhaps most glaringly—the fact that he had been arrested for attempted assault with a dangerous weapon just a day earlier. Because Cameron's appeal on the basis of qualified immunity is not coterminous with the issue of Wayne County's municipal liability, we lack pendent jurisdiction over the County.

Our conclusion is bolstered by the Supreme Court's holding in *Swint*. There, the Court reversed the Eleventh Circuit's exercise of pendent jurisdiction, which was based on the theory of judicial economy, over a county commission's appeal from the denial of summary judgment. 514 U.S. at 45. The Court held that the question of the county commission's liability was not

"inextricably intertwined" with the individual defendants' immunity from suit because the claim against the commission focused on whether one of the individual defendants qualified as a county policymaker, whereas the individual defendants' claims were based on whether they had violated clearly established law. *Id.* at 51. Here, Wayne County's potential liability is based on its alleged de facto policy of not reviewing an inmate's mental-health records in the MH-WIN system. This issue is not inextricably intertwined with the decision to deny summary judgment to Cameron based on qualified immunity, and a review of the former issue is not necessary to ensure a meaningful review of the latter. We therefore decline to exercise pendent jurisdiction over Wayne County's interlocutory appeal.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court with regard to the individual defendants and **DISMISS** Wayne County's interlocutory appeal for lack of jurisdiction.