RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0252p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

ZACKERY BECK,

*Plaintiff-Appellee*,

*v.*

HAMBLEN COUNTY, TENNESSEE,

*Defendant*,

No. 19-5428

ESCO JARNAGIN, Hamblen County Sheriff, in his individual capacity,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 2:17-cv-00178—Travis R. McDonough, District Judge.

Argued:  December 11, 2019

Decided and Filed:  August 10, 2020

Before:  BATCHELDER, WHITE, and MURPHY, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Jeffrey R. Thompson, O'NEIL, PARKER & WILLIAMSON, PLLC, Knoxville, Tennessee, for Appellant.  Lance K. Baker, THE BAKER LAW FIRM, Knoxville, Tennessee, for Appellee.  **ON BRIEF:**  Jeffrey R. Thompson, N. Craig Strand, O'NEIL, PARKER & WILLIAMSON, PLLC, Knoxville, Tennessee, for Appellant.  Lance K. Baker, THE BAKER LAW FIRM, Knoxville, Tennessee, Thomas C. Jessee, JESSEE & JESSEE, Johnson City, Tennessee, for Appellee.

---

**OPINION**

---

MURPHY, Circuit Judge.  Zackery Beck claims to have been assaulted by other inmates while detained at the jail in Hamblen County, Tennessee.  He seeks damages from Hamblen County Sheriff Esco Jarnagin under 42 U.S.C. § 1983.  But his claim faces an immediate obstacle: Sheriff Jarnagin had no direct involvement in Beck's detention, and § 1983 does not impose vicarious liability on supervisors for their subordinates' actions.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  Beck responds that the overcrowded jail has repeatedly flunked minimum standards and that Jarnagin has long known of its failures.  Beck thus seeks to hold Jarnagin liable for his assault on the ground that Jarnagin has been deliberately indifferent to inmate safety.  Yet our existing caselaw would not have clearly signaled to Jarnagin that his responses to the overcrowding problem were so unreasonable as to violate the Fourteenth Amendment.  We thus reverse the district court's denial of qualified immunity to Jarnagin.

I

A

On October 3, 2016, Beck was arrested for alleged drug crimes.  He was booked in the Hamblen County Jail the next morning.  His booking sheet listed Beck's age as 22, his height as six feet, two inches tall, and his weight as 148 pounds.  Beck also underwent screening under the Prison Rape Elimination Act (PREA) to assess his risk of sexual assault from other inmates.  The booking officer decided that Beck had no history of sexual assault and classified him as a "Non-Victim" based on various factors, including age, physical stature, disability, and sexual orientation.  Yet the officer failed to identify a safety classification for Beck in a separate "status classification assessment sheet."  That sheet noted that no status-assessment record was available.

On October 5, corrections officers moved Beck to a four-person cell, A-4.  During the transfer, Beck allegedly overheard an inmate warn a corrections officer not to put Beck "in little Mexico" and "that if you do, it's going to be bad for him."  Despite that warning, officers placed

Beck in this four-person cell with two inmates whom Beck described as "Mexican": Sergio Cisneros and William Rayle.

On October 7, Beck was watching a television located outside his cell when an inmate in the adjoining cell suggested he come closer for a better view. After Beck walked over, the inmate grabbed him through the bars between the cells and held a shank made of shower tile to his throat. Meanwhile, Cisneros pulled down Beck's pants and put his fingers into Beck's rectum to search for drugs. The attackers warned Beck that they would kill him if he did not stay quiet. Beck described this assault as "very painful and something I never want to go through again in life." (Cisneros denied the assault and prosecutors found insufficient evidence to charge him, but we must view the facts in the light most favorable to Beck.)

Beck did not initially tell corrections officers about this attack. Three days later, Cisneros and other inmates told officers that Beck had been stealing from them and that he had better get moved. The officers moved Beck to a cell in another area.

On October 12, Beck filed a request asking for immediate medical assistance because Cisneros's prior assault continued to cause rectal bleeding. The request went unanswered that day.

The next morning, Beck told his mother about the assault over the phone, explaining that he could get released if she posted a $100 bond. She refused to post bond at that time, believing he was lying. Soon after that call, another inmate allegedly broke into Beck's cell and repeatedly punched him in the throat. Officers broke that fight up and took Beck to another cell. But Beck asserts that other inmates there were threatening him within minutes of this transfer. Officers took him to yet another cell to be housed alone.

Later that day, officers found Beck lying on the ground in his cell with a blanket wrapped around his neck. Beck says he feigned suicide to gain the opportunity to talk to someone other than the guards. Officers brought Beck to the medical station, where he told a nurse that Cisneros had sexually assaulted him. An officer transported Beck to a hospital. According to hospital records, a physical exam showed a small rectal tear with no active bleeding (from Cisneros's alleged assault) and injuries to Beck's lower lip and neck area (from the later attack

by the other inmate).  The hospital report listed the diagnoses as an assault with anal penetration, a contusion to the neck, and a right lower lip contusion.

Upon returning to the jail, Beck was placed on suicide watch for a few days.  He was released a short time later.

B

Sheriff Jarnagin had no personal involvement with Beck's detention.  Jarnagin delegates much of the jail's day-to-day operations to others, including Teresa Laws, the jail administrator, and Chief Deputy Wayne Mize.  But Beck believes that systemic problems at the jail caused the assaults.  He has been detained at the jail many times.  And while he was never physically assaulted before October 2016, he says that "almost every time I go to that jail I'm in fear for my life."

The jail was designed around 1977.  Since 2010, it has not met the minimum standards for the safety of inmates set by the Tennessee Corrections Institute, a state entity tasked with creating jail standards.  Tenn. Code. Ann. § 41-4-140(a)(1).  The Tennessee Corrections Institute has identified the jail's failures in inspection reports that it has sent to Sheriff Jarnagin each year.  *See id.* § 41-4-140(a)(3).  In 2014, county administrators also tasked Carter Goble Associates with undertaking a needs assessment, and that assessment likewise found many of the same deficiencies.

Most of the jail's problems stem from what Chief Deputy Mize has called "chronic" overcrowding.  According to the 2016 report from the Tennessee Corrections Institute, the jail has a maximum capacity of 255 inmates, but housed an average of 365 inmates during the first half of 2016.  This overcrowding creates safety risks.  To begin with, it affects the jail's ability to classify inmates.  Administrators seek to detain inmates based on their threat level: They seek to house less dangerous inmates charged with misdemeanors in one area and more dangerous inmates charged with felonies in others.  Yet the 2016 report noted that overcrowding has made the "classification process" "impossible to achieve."  This report added that the classification failures were "evident" from the number of inmate-on-inmate assaults: 153 between January and July 7, 2016.

In addition, up to 100 inmates must sleep on mats on the floor during times of peak overcrowding.  These inmates, according to Chief Deputy Mize, are also placed at greater risks of assault.

Staffing shortages exacerbate the safety concerns.  The reports from the Tennessee Corrections Institute have repeatedly noted that the jail needs more corrections officers.  According to a 2013 report, "the lack of security checks and inmate counts is a direct reflection of insufficient staffing to perform the necessary duties to maintain the safety and security throughout the facility."  The 2016 report likewise flagged two-hour "time gaps" between physical security checks.  According to Chief Deputy Mize, corrections officers ideally should do security checks every hour.

The jail's physical layout also exacerbates the safety concerns.  The 2016 report suggested that the jail "does not have enough cells to accommodate the facility's classification plan."  And it noted that the lighting in some areas of the jail can be controlled only by the inmates, so "[o]fficers have to enter areas with very little lighting and have the inmates turn on lights in the cells to be able to see."

As the report from Carter Goble Associates concludes, "the jail is overcrowded, understaffed, and has an antiquated design."  Sheriff Jarnagin has taken some steps to combat these problems.  When he became sheriff in 2006, he told the Hamblen County Commissioners, the relevant decisionmakers, that the county would need a new jail soon.  The commissioners have opted not to build one.  They have, however, increased funding for the jail, which has allowed administrators to hire about 16 new corrections officers since 2010.  Still, the same problems that existed in 2010 continue to exist today.  Sheriff Jarnagin and Chief Deputy Mize have notified the commissioners over and over again of the continued risks and the need to address the problem.  But the commissioners have told Sheriff Jarnagin that they cannot fix this jail issue due to "[b]udget restraints."

C

Beck sued Sheriff Jarnagin and Hamblen County under 42 U.S.C. § 1983.  He initially challenged both of the assaults from October 2016, but later clarified that he sought relief only

for the purported sexual assault by Cisneros. Beck sought damages from Jarnagin in his personal capacity, alleging that the sheriff had been deliberately indifferent to inmate violence in violation of the Fourteenth Amendment. Beck also sought damages from Hamblen County under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), alleging that it had a custom of failing to protect inmates and adequately train officers. And Beck asserted state-law claims against both Jarnagin and Hamblen County.

For the most part, the district court denied Jarnagin and Hamblen County's motion for summary judgment. Most relevant here, the court denied qualified immunity to Sheriff Jarnagin on Beck's claim under the Fourteenth Amendment. It held that pretrial detainees have a clearly established right to be free from a government official's deliberate indifference to inmate assaults. This deliberate-indifference claim, the court noted, requires inmates to show that an objective risk of serious harm existed, that the official subjectively knew of that risk, and that the official failed to take reasonable measures to reduce it. Applying these standards, the court held that a jury could find an objective risk of inmate-on-inmate violence based on the jail's safety problems, including its overcrowded conditions, inoperative classification system, and infrequent security checks. The court next held that a jury could find that Jarnagin had knowledge of this risk based on the reports from the Tennessee Corrections Institute. The court lastly held that the jury could find that Jarnagin did not reasonably respond to the risk. Despite his "efforts to construct a new jail or obtain additional funding," the court reasoned, the jury could find that he disregarded "alternative or interim fixes to reduce the risk" of assaults.

Turning to the other claims, the court held that Beck adequately established his deliberate-indifference claim against Hamblen County under *Monell*. It found an issue of fact as to whether Hamblen County had a custom of ignoring the jail's dangerous conditions and the risk of inmate-on-inmate violence. The court lastly allowed Beck's state-law claims to proceed against Sheriff Jarnagin, but not against Hamblen County.

Sheriff Jarnagin filed this interlocutory appeal of the denial of qualified immunity. The appeal involves only Beck's deliberate-indifference claim against Jarnagin. We review the district court's denial of summary judgment de novo, taking the facts in the light most favorable

to Beck. *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992 (6th Cir. 2017); *see Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (en banc).

II

To overcome a qualified-immunity defense, § 1983 plaintiffs must show two things: that government officials violated a constitutional right and that the unconstitutionality of their conduct was clearly established when they acted. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). The Supreme Court has told us that we may address these two issues in the order we think best. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In this case, we think it best to resolve the appeal on the "clearly established" prong alone without deciding whether Sheriff Jarnagin violated Beck's constitutional rights. *See id.* at 237. Whether or not Jarnagin adequately attempted to remedy the problems at the jail within the meaning of the Fourteenth Amendment, the unconstitutionality of his conduct was not "beyond debate"—as it must be to rebut his qualified-immunity defense. *Wesby*, 138 S. Ct. at 589 (citation omitted).

A

Qualified immunity shields a government official from money damages (and litigation) unless the official's conduct violated a "clearly established" legal rule. *Pearson*, 555 U.S. at 232. To create such a clearly established rule, a case need not be "on all fours" with the plaintiff's case. *Vanderhoef v. Dixon*, 938 F.3d 271, 278 (6th Cir. 2019) (citation omitted). Rather, such a rule can arise "from direct holdings, from specific examples describing certain conduct as prohibited, or from the general reasoning that a court employs." *Id.* at 279 (citation omitted). Nevertheless, the fact pattern of the prior case must be "similar enough to have given 'fair and clear warning to officers' about what the law requires." *Id.* (citation omitted). That is, a rule "is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates'" the rule. *Carroll v. Carman*, 574 U.S. 13, 16 (2014) (per curiam) (citation omitted). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Wesby*, 138 S. Ct. at 589 (citation omitted).

The standard sets a high bar because it requires a plaintiff to identify with "a high 'degree of specificity'" the legal rule that a government official allegedly violated. *Id.* at 590 (citation omitted). The rule "must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (citation omitted). Given this requirement, the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775–76 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Such an abstract framing "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014).

The Supreme Court has also told us how to decide if a plaintiff has identified a sufficiently specific legal rule: The plaintiff has identified a rule at too high a level of generality "if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the identified rule] was firmly established.'" *Wesby*, 138 S. Ct. at 590 (citation omitted). Consider, for example, that the Court has long held that the Fourth Amendment bars officers from making arrests without probable cause. *Id.* at 586. This general rule—that officers must have probable cause—typically will not answer whether an officer had probable cause on a particular occasion. *Id.* at 590. "Given its imprecise nature, officers will often find it difficult to know how the general standard of probable cause applies in 'the precise situation encountered.'" *Id.* (citation omitted). So "a body of relevant case law" addressing similar facts "is usually necessary" to show a violation of a clearly established rule in the probable-cause context. *Id.* (citation omitted).

Or consider that the Supreme Court has long held that the Fourth Amendment bars the police from using excessive force. *See Pauly*, 137 S. Ct. at 551–52. Here too, the Court has noted that articulating the rule against excessive force at this "general level" will typically not clearly establish that force was excessive on a particular occasion. *Id.* at 552. "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam)).

We have extended this logic to deliberate-indifference claims under the Fourteenth Amendment. *Arrington-Bey*, 858 F.3d at 992–94; *Perez v. Oakland County*, 466 F.3d 416, 426–28 (6th Cir. 2006). In *Arrington-Bey*, for example, the mother of a pretrial detainee who suffered from bipolar disorder and died in jail alleged that the police were deliberately indifferent to his medical needs. 858 F.3d at 990. The police had arrested the decedent for disruptive behavior, and he had continued that behavior while detained. *Id.* at 990–91. When allowed to make a phone call, he attacked officers and died in the ensuing altercation from a "sudden cardiac event." *Id.* at 992. We recognized that pretrial detainees have a right to receive care for serious medical needs. *Id.* But we found that this general framing described the right at too high a level of generality. *Id.* at 992–93. We noted "that a plaintiff must identify a case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires." *Id.* at 993 (quoting *Pauly*, 137 S. Ct. at 552). And we could find no cases holding that police needed to seek immediate medical attention for an individual in the circumstances they confronted. *Id.* at 993–94.

B

Under this law, Sheriff Jarnagin is entitled to qualified immunity on Beck's deliberate-indifference claim. We begin with the governing legal principles. In the context of inmate-on-inmate violence, the Supreme Court has held that "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment" rights of convicted prisoners. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). To prove this type of deliberate-indifference claim, a prisoner first must establish an objective element: that the prisoner "is incarcerated under conditions posing a substantial risk of serious harm." *Id.* at 834. The prisoner next must establish a subjective element: that the government official subjectively knew of this risk of harm. *Id.* at 837. The prisoner must lastly show that the official failed to "respond[] reasonably to the risk." *Id.* at 844; *see Richko v. Wayne County*, 819 F.3d 907, 915 (6th Cir. 2015). Section 1983 also permits plaintiffs to obtain damages from a government official only for that official's own actions, not for the actions of others. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). So whether an official was deliberately indifferent to the risk of inmate

violence depends on the official's own knowledge and actions. *See Bishop v. Hackel*, 636 F.3d 757, 767 (6th Cir. 2011).

While the Eighth Amendment (and its ban on certain "punishments") does not apply to pretrial detainees like Beck who have not been convicted, we have previously held that *Farmer*'s test for a prisoner's claim under the Eighth Amendment applies "with equal force" to a pretrial detainee's substantive-due-process claim under the Fourteenth Amendment. *Richko*, 819 F.3d at 915. That said, in a recent decision clarifying the standards for a pretrial detainee's excessive-force claim against a corrections officer under the Fourteenth Amendment, the Supreme Court held that the officer may be found liable for using *objectively* unreasonable force against the detainee—whether or not the officer *subjectively* believed the level of force was unreasonable. *See Kingsley v. Hendrickson*, 576 U.S. 389, 391–92 (2015). Courts are split over whether *Kingsley*'s holding for excessive-force claims should also modify the subjective element from *Farmer* that we have traditionally applied to pretrial detainees' deliberate-indifference claims. *See Miranda v. County of Lake*, 900 F.3d 335, 350–54 (7th Cir. 2018) (citing cases). We have yet to resolve this question. *See Richmond v. Huq*, 885 F.3d 928, 938 n.3 (6th Cir. 2018). So *Kingsley*'s effect on Beck's deliberate-indifference claim (if any) cannot qualify as "clearly established" law under the qualified-immunity test. *See Wilson v. Layne*, 526 U.S. 603, 618 (1999). Indeed, Beck does not even cite *Kingsley*. We thus assume that *Farmer*'s rules still apply in this pretrial-detainee context.

Even taking the facts in the light most favorable to Beck, we cannot find that the unconstitutionality of Sheriff Jarnagin's conduct was "beyond debate" under *Farmer* at the time of the assault on Beck. *Wesby*, 138 S. Ct. at 589 (citation omitted). We start, as we must under the qualified-immunity caselaw, with "the particular circumstances that [Sheriff Jarnagin] faced." *Plumhoff*, 572 U.S. at 779. Beck has identified no evidence suggesting that Jarnagin had any personal knowledge of Beck's *specific* situation. Jarnagin, for example, did not help choose the cell in which Beck was detained. Jarnagin also had not heard the warnings about placing Beck in a cell with Cisneros. *Cf. Richko*, 819 F.3d at 918. And he did not know of any of Beck's personal characteristics that might make him more susceptible to assault. *Cf. Bishop*, 636 F.3d at 767–68. Instead, Beck seeks to hold Jarnagin liable on a *general* theory that would apply

just as much to any assault at the jail as it would to the assault on Beck.  For the first deliberate-indifference element (a substantial risk of serious harm), Beck cites the reports by the Tennessee Corrections Institute describing the safety concerns at this overcrowded and understaffed jail. *See Farmer*, 511 U.S. at 834.  For the second deliberate-indifference element (knowledge of the risk), Beck notes that Jarnagin readily admits he knew of those general safety concerns.  *See id.* at 837.  For the third deliberate-indifference element (unreasonably failing to reduce the risk), Beck argues that Jarnagin should have done more to reduce this general risk of violence.  *See id.* at 844–45.

With regard to *Farmer*'s third element, however, Jarnagin did make *some* efforts "to abate" this general risk of inmate-on-inmate violence.  *Id.* at 847.  Starting from when he first became sheriff, he has repeatedly described the safety concerns to the Hamblen County Commissioners and stated his view that the commissioners should build a new jail.  Jarnagin has also obtained increased funding, which has allowed him to hire more corrections officers.  Not only that, the safety problems detailed by the Tennessee Corrections Institute largely fell outside Jarnagin's control because he was unable to limit the number of inmates at the jail.  Sheriff Jarnagin also did not have the power to allocate more taxpayer dollars to the safety problems— whether by building a new jail or by hiring more staff.  Those budgetary decisions fell within the prerogative of the county commissioners.

Under the qualified-immunity test, therefore, Beck must prove that it would have been "clear to a reasonable officer" that Jarnagin's responses to the risk of inmate-on-inmate violence were so inadequate that we can describe him as "plainly incompetent" in thinking they satisfy constitutional standards. *Wesby*, 138 S. Ct. at 589–90 (citation omitted).  Beck has not made that showing.   For starters, *Farmer*'s reasonableness test—like the Fourth Amendment's reasonableness test—does not itself provide "fair warning" to Jarnagin that his responses to the risk of inmate-on-inmate violence were constitutionally inadequate.  *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam).  And Beck has "point[ed] to no Supreme Court or Sixth Circuit case" that would have "given 'fair and clear warning to [Jarnagin]' about what the law requires" in the situation in which he found himself: a resource-limited official who knew of general safety concerns arising from overcrowding and understaffing problems largely outside

his control.  *Arrington-Bey*, 858 F.3d at 993 (quoting *Pauly*, 137 S. Ct. at 552); *cf. Taylor v. Barkes*, 135 S. Ct. 2042, 2044–45 (2015) (per curiam).

Indeed, a pre-*Farmer* case found resource constraints relevant to defending against a deliberate-indifference claim.  *See Roberts v. City of Troy*, 773 F.2d 720, 725 (6th Cir. 1985).  In *Roberts*, an inmate had committed suicide in a city jail and his estate alleged that the chief of police had been deliberately indifferent by failing "to promulgate and enforce procedures to identify potential suicides and prevent their occurrence."  *Id.* at 722.  After a jury disagreed, the estate challenged the jury instructions.  *Id.* at 724.  In the process of rejecting that challenge, we suggested that "the police chief's failure to provide better suicide prevention training" did not establish a constitutional violation in part "because the failure[] arose from the allocation of resources—time, personnel, and money, which constitutes a legitimate governmental purpose." *Id.* at 725; *see also Perez*, 466 F.3d at 431; *May v. County of Trumbull*, 1997 WL 651662, at *3 (6th Cir. Oct. 20, 1997) (per curiam).

All told, neither the Supreme Court nor our court has issued a decision concluding that a government actor responded unreasonably to a known risk of harm when the actor took actions similar to the actions that Jarnagin took here.  Under the Supreme Court's precedent, therefore, Beck cannot overcome Jarnagin's qualified-immunity defense.  *See Wesby*, 138 S. Ct. at 591.

C

Beck and the district court identify no factors that convince us otherwise.  The district court correctly noted that we have repeatedly recognized that the "right to be free from violence at the hands of other inmates . . . was clearly established by the Supreme Court in *Farmer*[.]" *Richko*, 819 F.3d at 915; *Bishop*, 636 F.3d at 766.  Yet framing the deliberate-indifference test at this "high level of generality" cannot overcome Sheriff Jarnagin's qualified-immunity defense in "the specific context of [this] case."  *Mullenix v. Luna*, 136 S. Ct. 305, 311 (2015) (per curiam) (citation omitted).  Just as the general right to be free from excessive force often will not clearly establish whether an officer used excessive force on a given occasion, *Emmons*, 139 S. Ct. at 503, so too the general right to be free from inmate violence will often not clearly establish whether an official reasonably responded to the risk of violence on a given occasion.  That is the

case here. The general right against inmate violence does not answer "the crucial question" whether Jarnagin responded reasonably to the general safety risks. *Plumhoff*, 572 U.S. at 779; *see Perez*, 466 F.3d at 428. That is because "the unlawfulness of [Jarnagin's response] 'does not follow immediately from the conclusion that [a right against inmate violence] was firmly established'" by *Farmer*. *Wesby*, 138 S. Ct. at 590 (citation omitted).

The district court next relied on an unpublished decision suggesting that "[a] case could be made as to the [constitutional] liability of a sheriff responsible for a jail where 'inmate-on-inmate violence occurred regularly when the jail was overcrowded, as it was [when the incident in question occurred].'" *Fisher v. Cocke County*, 1996 WL 520793, at *4 (6th Cir. Sept. 12, 1996) (third alteration in original) (quoting *Hale v. Tallapoosa County*, 50 F.3d 1579, 1583 (11th Cir. 1995)). But *Fisher*'s statement was pure dictum because we found the sheriff entitled to qualified immunity. *Id.* at *3–5. In any event, *Fisher* did not clearly establish what such a "case" for liability would require.

The district court thus turned to two out-of-circuit decisions—*Lopez v. LeMaster*, 172 F.3d 756, 761–62 (10th Cir. 1999), and *Hale*, 50 F.3d at 1583–84. Yet "our sister circuits' precedents are usually irrelevant to the 'clearly established' inquiry." *Ashford v. Raby*, 951 F.3d 798, 804 (6th Cir. 2020). They can create a clearly established rule only in extraordinary situations. *See Hearring v. Sliwowski*, 712 F.3d 275, 282 (6th Cir. 2013). The precedent "must point [unmistakably] to the unconstitutionality of the conduct and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional." *Perez*, 466 F.3d at 427 (alteration in original) (citation omitted).

The two decisions here do not meet this standard. *Lopez* allowed a claim alleging a general risk of violence at a jail to proceed against a sheriff. 172 F.3d at 761–62. But the court expressly noted that the sheriff had not moved for summary judgment on the basis that he "had tried to correct the deficiencies but was hindered by lack of funds." *Id.* at 762 n.4. So it could not have clearly established a contrary rule in that situation.

*Hale* likewise considered a claim that a sheriff had been indifferent to the general safety risks at a jail. 50 F.3d at 1583. The court found that the plaintiff had created a jury question

over whether the sheriff's efforts to build a new jail were a reasonable response to that risk or whether the sheriff should have taken "'alternative means' or interim measures for reducing the risk of violence[.]" *Id.* at 1584 (citation omitted). Whether right or wrong, *Hale*'s conclusion on this constitutional question is not "so clearly foreshadowed by applicable direct authority" as to allow us to rely on it in this qualified-immunity context. *Perez*, 466 F.3d at 427 (citation omitted). *Hale* itself recognized that its holding came "perilously close to second-guessing the difficult choices that prison officials must face," 50 F.3d at 1584 (citation omitted), something that the Supreme Court has cautioned against, *see Bell v. Wolfish*, 441 U.S. 520, 547 (1979). So the Eleventh Circuit's decision was not compelled by existing precedent.

The district court ended with a factual point. While conceding Sheriff Jarnagin's "efforts to construct a new jail or obtain additional funding," the court reasoned that a jury question existed over whether he could have done *more* by making "interim fixes." It specifically mentioned Jarnagin's purported concession that "fixing the classification of inmates" "would not necessarily require additional funding." Yet the 2016 report from the Tennessee Corrections Institute noted that overcrowding has made the "classification process" "impossible to achieve." And when asked whether fixing the classification system would cost money, Jarnagin responded that "it wouldn't cost anything per se," but that the jail would need "the manpower to make sure that it is conducted." (He has, in fact, successfully lobbied for additional staff over the years.) Regardless, even assuming that Jarnagin might have better fixed the classification system, Beck has identified no clearly established legal rule that would have put the sheriff on notice that his responses to the general safety risks at the jail were unconstitutional unless he also made that fix. So this fact-based argument cannot overcome Jarnagin's qualified-immunity defense.

For his part, Beck suggests that Sheriff Jarnagin disputes factual issues and that we lack jurisdiction over his appeal under *Johnson v. Jones*, 515 U.S. 304 (1995). Not so. The question whether an official's conduct (when viewed in the light most favorable to the plaintiff) violates clearly established deliberate-indifference law raises a legal issue that we review de novo. *See Williams*, 186 F.3d at 690. That is the issue that Sheriff Jarnagin raises here.

\*   \*   \*

Sheriff Jarnagin's entitlement to qualified immunity does not leave Beck without any potential recourse for the assault that he claims to have suffered and the general safety concerns that he identified. After all, Beck also sued Hamblen County. He claims that individuals such as Sheriff Jarnagin and Chief Deputy Mize have repeatedly notified the county of the safety concerns at the jail, and that the county's longstanding failure to address the problem shows an unconstitutional custom of deliberately disregarding inmate safety. *See Monell*, 436 U.S. at 694. The district court allowed that claim to proceed to trial, along with other state-law tort claims against Jarnagin. We do not express an opinion on the viability of these other claims. But because the law did not clearly establish the unreasonableness of Jarnagin's responses to the general safety concerns that Beck alleges, Jarnagin is entitled to qualified immunity under § 1983. We reverse the district court's contrary decision and remand for proceedings consistent with this opinion.