RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0046p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DAVID REEDY,

*Plaintiff-Appellant*,

*v.*

> No. 20-1367

MICHAEL WEST,

*Defendant-Appellee*.

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:16-cv-13876—Bernard A. Friedman, District Judge.

Argued: January 26, 2021

Decided and Filed: February 24, 2021

Before: GUY, LARSEN, and MURPHY, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Erin Bartels, MICHIGAN STATE UNIVERSITY COLLEGE OF LAW, East Lansing, Michigan, for Appellant. Sara Trudgeon, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Daniel E. Manville, MICHIGAN STATE UNIVERSITY COLLEGE OF LAW, East Lansing, Michigan, for Appellant. Sara Trudgeon, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

───────────────

## OPINION

───────────────

RALPH B. GUY, JR., Circuit Judge. Former state prisoner David Reedy asserts an Eighth Amendment failure-to-protect claim against a prison counselor, Defendant Michael West, for allegedly failing to take measures to abate the brutal assault Reedy suffered at the hands of

his prison cellmate, Oscar Hensley. Finding the evidence insufficient, the district court granted summary judgment to West and rejected a magistrate judge's contrary report and recommendation. We AFFIRM.

## I.

### A. Factual Background

Reedy was a prisoner at a facility managed by the Michigan Department of Corrections (MDOC) in 2016. In March 2016, Reedy's cellmate was moved, and Oscar Hensley became Reedy's new cellmate. In the first hours of July 20, 2016, Reedy was assaulted by Hensley.

Reedy testified that, "[f]or the most part," his relationship with Hensley prior to the assault "was good." The two prisoners first met when Hensley moved in as Reedy's cellmate. Two days later, Reedy learned from other inmates that Hensley was moved because he had been caught masturbating to pictures of his cellmate's grandchildren. Reedy never confronted Hensley with this information but, from then on, Reedy and Hensley did not talk much. Reedy kept to himself (staying away from the cell from 8:00 A.M. to 11:00 P.M. attending classes), and Hensley kept to himself. At the time, Hensley was a fifty-three-year-old Caucasian, stood six feet and one inch tall, weighed 198 pounds, and was serving a sentence for first-degree criminal sexual conduct involving a person under thirteen years of age.[1] Reedy was a forty-seven-year-old African American, stood five feet and eight inches tall, weighed 160 pounds, and was serving a sentence for operating a motor vehicle while intoxicated.[2]

According to Reedy, Hensley first threatened him sometime in late June. The "last threat" Hensley made toward Reedy was at the "end of June, early July." In his verified complaint, Reedy alleges that on about June 18, 2016, he told Assistant Resident Unit Supervisor (ARUS) Edwin Wade "about the threats against [his] life made by [Hensley]." Wade's caseload included Hensley and Reedy, as they were housed in the section of the prison Wade covered.

---

[1]*Biographical Information*, MDOC, https://mdocweb.state mi.us/OTIS2/otis2profile.aspx?mdocNumber=1 79233 (last visited Feb. 22, 2021).

[2]*Biographical Information*, MDOC, https://mdocweb.state mi.us/OTIS2/otis2profile.aspx?mdocNumber=2 28995 (last visited Feb. 22, 2021).

On July 13, Reedy was able to locate prison counselor Michael West and spoke with him for "maybe 60 seconds."**3**   Reedy acknowledges that he was not assigned to West, did not regularly see West, and "didn't really have a relationship with [West]."   In the sixty-second interaction he had with West, Reedy states that he told West "that [his] bunkie had threatened [him] and we needed to move or can we do something about the situation[?]"   West allegedly responded, "I'll get back with you," and then never did.   When asked at his deposition if he told West "how [his] bunkie threatened [him]," Reedy candidly answered, "No, I didn't."

Six days later, at approximately 8:00 A.M. on July 19, Reedy and Hensley went together to West's office.   ARUS Wade was on vacation.   Reedy testified that Hensley went into the office first and spoke with West.   Reedy admits that he could not hear the conversation between West and Hensley.   Approximately sixty seconds later, Hensley stepped out of the office and West commented to Hensley, "do what you got to do."   Hensley then took a step back and, leaning into West's office, said, "do what I got to do?"   To which West replied, "yes."   At that point, Hensley walked away.

Reedy then went into the office to speak with West.   Reedy's counsel asked Reedy if he "reiterate[d] [his] fear for [his] safety," and Reedy answered, "Yes," without any further explanation.   "[A]ww, [Hensley] ain't going to do nothing," West allegedly replied, "if [Hensley] wants to move tell him to come hit me and I'll send him so far up north with paperwork up his . . . ."   (Ellipsis in original.)   Reedy did not "talk about anything else" with West on July 19.   And when Reedy was specifically asked if the above communications on July 13 and July 19 were "the entirety of [his] communications with Mr. West," Reedy answered unequivocally, "Yes, yes."

West also recalls the meeting with Reedy and Hensley on approximately July 19, but his version of the events is different.   According to West, the conversation took place outside his office door with Reedy, Hensley, and himself all present, but he claims Reedy did not say anything.   West testified that Hensley stated, "You guys got to move this motherfucker out of my

---

**3**West testified about the general job duties of prison counselors:  "We take care of paperwork, screening, anything else that needs to be done paperwork-wise for the most part.  We do . . . cell moves if we need to, transfer requests, security classification screens, grievance responses, [and] hearings."

cell" or "whatever happens . . . is going to be onto [you]." With that, West replied, "Hold on. You're not going to tell me who I am moving, who I'm not moving." West asked Hensley and Reedy "how old they were." After the inmates answered, West remarked, "You guys are adults. You know, any actions that you take, that falls upon you for anything that does happen." West admits that, at some point, Hensley stated that he needed "to be moved" or he was "going to do what he's got to do." After West concluded by saying, "You guys should be able to get this figured out," Hensley and Reedy walked away. West claims, however, that Reedy came back to West's office approximately a half hour later and said that he and Hensley had "talked and everything was good."[4]

Early the next morning, on July 20, Hensley used a softball-sized rock in a mesh laundry bag to beat Reedy while he was sleeping. Reedy sustained a laceration and contusions to his head and began seizing while he was receiving treatment.

Michigan State Police investigated the incident. The trooper who interviewed Reedy at the prison facility three days after the incident asked Reedy what issues there were between him and Hensley. First, Reedy advised that he did not have a problem with Hensley "throwing the sheet" (masturbating) on a daily basis, but there was "tension" because Hensley apparently felt that Reedy was talking with other prisoners about his masturbating. Second, the trooper asked if there were racial issues, and Reedy acknowledged that there were. Third, Reedy mentioned that he and Hensley had "several conversations regarding [Reedy] slamming the door." According to Reedy, Hensley did "not approve of how he shuts the door." Reedy explained that he and Hensley went to West to "request a room change." The trooper then asked Reedy "what his reason was to be moved and he stated that they were just too different to live with each other." In his MDOC grievance filed shortly thereafter and attached to his complaint, Reedy asserted that he had made "requests for a room change" to various prison staff because he claimed Hensley "was becoming increasingly menacing and hostile" toward him.

---

[4]Reedy's testimony acknowledging that he had recounted "the entirety of [his] communications" with West on July 19, implicitly (if not directly) conflicts with West's testimony. As such, the district court incorrectly considered as undisputed West's testimony that Reedy came back to West's office on July 19 and told West that he and Hensley had "talked and everything was good." *See* Fed. R. Civ. P. 56(e).

**B.      Procedural History**

Reedy filed this lawsuit under 42 U.S.C. § 1983 against defendants West, ARUS Wade, Warden Paul Klee, and three other prison officials, alleging a violation of his constitutional rights under the Eighth Amendment.  With the exception of West, the other defendants were later dismissed with prejudice pursuant to a stipulated order.

West moved for summary judgment on qualified immunity grounds, arguing Reedy had failed to establish a constitutional violation.  The magistrate judge issued a report and recommendation denying the motion, to which West filed timely objections.  The district court concluded that there was insufficient evidence for a reasonable jury to find in favor of Reedy as to both an objective, substantial risk of serious harm to Reedy prior to the assault and that West was deliberately indifferent to that risk.  Consequently, the district court sustained West's objections, rejected the magistrate judge's recommendation, and granted summary judgment in favor of West.  This timely appeal followed.

**II.**

"We review the district court's denial of summary judgment de novo."  *Beck v. Hamblen Cty.*, 969 F.3d 592, 598 (6th Cir. 2020) (citing *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (en banc)).  At summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'"  *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Summary judgment is appropriate when "no genuine dispute as to any material fact" exists and the moving party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). When the movant carries this burden, the nonmoving party must adduce "specific facts showing that there is a genuine issue for trial."  *See Haddad v. Gregg*, 910 F.3d 237, 243 (6th Cir. 2018) (citation omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

### III.

West sought summary judgment on the basis of qualified immunity. The doctrine of qualified immunity shields government officials from liability for civil damages unless the plaintiff establishes: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). West contests only the first prong.

The constitutional right at issue here is the Eighth Amendment's prohibition of "cruel and unusual punishments." U.S. CONST. amend. VIII. Although "prison officials have a duty [under the Eighth Amendment] to protect prisoners from violence at the hands of other prisoners," it is equally clear that not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials." *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994) (citations and internal quotation marks omitted). For a failure-to-protect claim to lie against a prison official, the plaintiff must show that: (1) "objectively," he was "incarcerated under conditions posing a substantial risk of serious harm," *id.* at 834; and (2) the official acted with "deliberate indifference" to inmate safety, meaning the official was "subjectively aware of the risk" and "fail[ed] to take reasonable measures to abate it." *Id.* at 829, 834, 847; *see Beck*, 969 F.3d at 600. Reedy's claim falters on both elements.

### A.     Objective Element

Reedy was not, objectively speaking, "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834; *see Bishop v. Hackel*, 636 F.3d 757, 761-62, 766 (6th Cir. 2011) (concluding the objective element was satisfied where a "small," nineteen year-old plaintiff who was "apparently mentally 'slow'" and did not have experience in jail had been placed in a cell with a forty-four-year-old inmate convicted of violent felonies, including sexual assault, and there were specific accounts that he had physically and sexually abused several other inmates); *Hamilton v. Eleby*, 341 F. App'x 168, 171 (6th Cir. 2009) (finding the objective element satisfied because documents from plaintiff's cell were used to prosecute an Aryan Brotherhood member for murder, plaintiff received a death threat bearing the gang's symbol, the

gang had taken a hit out on him, and members of the gang had previously "broke [plaintiff's] face" and attempted to stab him at a different prison).

According to Reedy's own testimony, his relationship with Hensley, "[f]or the most part . . . was good." Sure they did not play cards or go to the yard together, but "there really wasn't [*sic*] no real conflict or fire." Prior to the assault, there is no evidence that Hensley ever harmed Reedy. Nor is there evidence Hensley had a violent criminal history or was ever involved in a physical altercation in prison. *See Bishop*, 636 F.3d at 761-62, 766. Reedy asserted in his verified complaint that he told West "that [he] was in fear for [his] safety due to the threats against [his] life, and to please move [him] to another cell";[5] testified later that his "bunkie had threatened [him] and we needed to move or . . . do something about the situation"; and simply agreed with his counsel's question about whether he "reiterate[d] [his] fear for [his] safety." But these are conclusory statements unadorned by any supporting facts. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009). Reedy has not adduced any competent summary judgment evidence containing some further factual enhancement of any threat from Hensley.[6]

Moreover, Reedy testified that Hensley "first threatened" him sometime in late June, and that the "last threat" was at the "end of June, early July." And according to Reedy, late June was the time period he had a fear for his life—about a month before the assault—but nothing occurred. So when Reedy and Hensley (the alleged aggressor) visited West's office *together* on July 19 and claimed they needed to be separated, there was no "*substantial* risk of serious harm." *Farmer*, 511 U.S. at 834 (emphasis added). Indeed, Reedy stated that Hensley told West that he

---

[5]When Reedy later recounted at his deposition "the entirety of [his] communications with Mr. West" during the only two brief communications he had with West on July 13 and July 19, Reedy did not mention any "threats to his life," much less add any flesh to the bare-bones assertion in his verified complaint.

[6]The seven affidavits Reedy submitted from fellow prisoners are also vague and conclusory. These affidavits merely state that Reedy requested to be moved to another cell because his "cellmate" had demonstrated "minatory conduct"; was "hostile and threatening"; was "becoming increasingly threatening"; was "demonstrating" "hostility"; was "openly hostile"; was "hostile and menacing"; and had shown "open hostility" toward Reedy. None of these affidavits assert the "facts" of a single incident in which Hensley harmed or threatened Reedy. *See* Fed. R. Civ. P. 56(c)(4). The only other evidence Reedy points to is Hensley's abstract statement in the police report that "it was a white/ black issue" between himself and Reedy. But that statement is "inadmissible hearsay and therefore cannot defeat a motion for summary judgment," *Alexander*, 576 F.3d at 558 (citation omitted), and more importantly it says nothing about a "substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

simply did not approve of how Reedy shuts the door.  Given this context, Hensley's statement to West that "You guys got to move this motherfucker out of my cell" or "whatever happens . . . is going to be onto [you]," does not create an objective, substantial risk of harm.  If it did, a prison official would be obligated to move any inmate that uses profanity and threatens that *something* might happen if his demands for a cell change are not met.

At the end of the day, the issue here was just what Reedy said it was shortly after the assault: Reedy and Hensley "were just too different to live with each other."  Based upon the undisputed objective facts, Reedy has failed to raise a genuine issue of fact as to the objective element of his failure-to-protect claim.

**B.        Subjective Element**

Even if the record could be construed to support the first element of Reedy's failure-to-protect claim, there is no genuine issue of fact as to the subjective element: deliberate indifference on West's part.  *Farmer*, 511 U.S. at 834.  "An official is deliberately indifferent if he or she 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference.'"  *Bishop*, 636 F.3d. at 766-67 (quoting *Farmer*, 511 U.S. at 837).  This standard entails "more than mere negligence" and instead is akin to "subjective recklessness as used in the criminal law."  *See Farmer*, 511 U.S. at 835, 839-40.  "[W]hether [West's] conduct, as alleged by [Reedy], could constitute deliberate indifference—is a mixed question of law and fact."  *Bishop*, 636 F.3d. at 764.  In determining whether an official was deliberately indifferent, we focus on the individual official's personal involvement, knowledge, and actions.  *Beck*, 969 F.3d at 600; *Bishop*, 636 F.3d. at 768.

Here, Reedy admits that he was not assigned to West, did not regularly see West, and "didn't really have a relationship with [West]."  West worked with the inmates in the C and D wings of housing security level two; Reedy and Hensley were housed on ARUS Wade's side and assigned to his caseload.  West was generally familiar with what Reedy looked like but the only time he had seen Hensley was on July 19.

Therefore, Reedy's only evidence of what West knew about Hensley and Reedy is limited to a total of two conversations Reedy had with West on July 13 and July 19—each roughly sixty seconds—during which Reedy alleges he made some vague statement that he was in "fear for [his] safety" or that Hensley had "threatened" him. Such brief exposure to Reedy's alleged plight is not "enough personal contact with [Reedy] to be subjectively aware" of any risk Hensley posed to his safety. *See Bishop*, 636 F.3d. at 768-71 (reversing denial of summary judgment as to three defendants who had limited contact with the plaintiff). Reedy merely told West on July 13 "that [his] bunkie had threatened [him] and we needed to move or can we do something about the situation[?]"; and on July 19 Reedy "reiterate[d] [his] fear for [his] safety" to West.

As noted, this conclusory evidence does not suffice. The purpose of summary judgment is to determine whether a material fact dispute exists for the jury to resolve, "not to replace conclusory allegations of the complaint or answer with conclusory allegations [in] an affidavit," verified complaint, or deposition. *See Lujan*, 497 U.S. at 888; *see also Alexander*, 576 F.3d at 560; *Tschappatt v. Crescent Metal Prods.*, 798 F. App'x 887, 889 (6th Cir. 2020).[7]

That leaves Hensley's demand to West that "You guys got to move this motherfucker out of my cell" or "whatever happens . . . is going to be onto [you]" and Hensley's remark that he was "going to do what he's got to do." But this statement alone is insufficient. "[T]hreats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Varmado-El v. Martin*, 52 F. App'x 764, 765-66 (6th Cir. 2002) (quoting *Prater v. Dahm*, 89 F.3d 538, 541 (8th Cir. 1996)) (concluding defendant was not deliberately indifferent despite hearing argument between two cellmates in which one called the other "'bitch' and 'nigger,' pushed him, and threatened to 'kick his ass' once they

---

[7]Reedy's seven affidavits from fellow prisoners do nothing to move the needle on the issue of deliberate indifference. Aside from being vague and conclusory, *see supra* note 6, five of the affidavits do not even mention West. The other two affidavits are not based on personal knowledge. Fed. R. Civ. P. 56(c)(4). Although these two affidavits summarily claim to be based on "personal knowledge," there is no indication that either prisoner was present when Reedy went to West, among others, to request to move cells, or heard West say "deal with it" to Reedy. *See Gardner v. Evans*, 920 F.3d 1038, 1054 (6th Cir. 2019). And to the extent we may even consider Hensley's hearsay statement, "it was a white/ black issue," in the post-assault police report, *supra* note 6, nothing suggests this was communicated to West and, therefore, we cannot consider the statement as part of West's personal knowledge before the assault for purposes of the deliberate-indifference test. *See Farmer*, 511 U.S. at 837; *Beck*, 969 F.3d at 600.

returned to the cell"); *see also, e.g.*, *Marbury v. Warden*, 936 F.3d 1227, 1236-37 (11th Cir. 2019) (per curiam); *Turner v. Okla. Cty. Bd. of Cty. Comm'rs*, 804 F. App'x 921, 926 (10th Cir. 2020).

First, West did not subjectively perceive Hensley's statement as a threat to Reedy. West asked Reedy and Hensley "how old they were" and believed that Hensley, like other inmates, was just "say[ing] anything" to obtain a new cellmate. So West directed Reedy and Hensley to "get this figured out." This was two adult inmates with cohabitation issues to overcome. West saw it that way, and Reedy admittedly saw it that way too: "they were just too different to live with each other." Reedy has not offered any evidence to contradict West's subjective beliefs. He cannot simply "rely on the hope that the trier of fact will disbelieve" West's evidence. *See Alexander*, 576 F.3d at 558 (citation and internal quotation marks omitted).

Second, Reedy does not belong to a class of prisoners particularly vulnerable to assault. *See, e.g.*, *Bishop*, 636 F.3d at 761-62, 767, 771 (finding deliberate indifference based upon consultant's report regarding the vulnerability of a "small," "mentally 'slow,'" nineteen-year-old plaintiff who had been sexually abused and an official's testimony in another case that "small, youthful prisoners are especially vulnerable to sexual pressure" (citation omitted)); *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (citing testimony and forms signed by defendants showing that they were aware transgender inmates were particularly at risk and that they knew that plaintiff was a transgender inmate). And there is no evidence that West was aware of any information suggesting that Hensley had a propensity for violence, had assaulted anyone, or was disciplined in prison. *Greene*, 361 F.3d at 294-95 (noting assailant's two convictions for felonious assault during a prison riot; defendant's concession that assailant had a "long institutional history of being a disruptive, violent inmate"; and defendant's admission that assailant was a "predatory inmate"); *Bishop*, 636 F.3d at 762-63, 771 (defendant was told by plaintiff or other prison staff about the *details* of multiple instances of the assailant physically and sexually abusing plaintiff and several other inmates, and was also aware assailant was jailed for criminal sexual conduct and that a S.W.A.T. team was called on him).

Nor can it be said that there was an "obvious," substantial risk to Reedy's safety such that a factfinder may be permitted to nonetheless conclude that West "must have known" of such a

risk. *See Farmer*, 511 U.S. at 842-43. Indeed, there is no evidence that West was exposed to information regarding a substantial risk that was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past." *See id*. at 842. A "metaphysical doubt as to the material facts," *Scott*, 550 U.S. at 380 (quoting *Matsushita*, 475 U.S. at 586), "a scintilla of evidence in support of [Reedy's] position," *Anderson*, 477 U.S. at 252, or "evidence [that] is merely colorable, or is not significantly probative" is not enough for Reedy to stave off summary judgment. *Id.* at 249-50 (internal citations omitted).

Viewing the record facts in the light most favorable to Reedy, he has not created a triable issue of fact to support an Eighth Amendment failure-to-protect claim. West is therefore entitled to qualified immunity.

*     *     *

For the foregoing reasons, we AFFIRM.