NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0425n.06

No. 21-3970

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

Oct 21, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| BRENDON SCHOONOVER, | ) | |
| Plaintiff - Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| K. R. ROGERS; KENNY CORRILL, | ) | |
| Defendants - Appellees. | ) | |

Before: BOGGS, LARSEN, and DAVIS, Circuit Judges.

BOGGS, Circuit Judge. While serving a 90-day sentence at the Adams County Jail, Brendon Schoonover was beaten for several hours by a group of inmates led by Clinton Waters. He sued Sheriff K. R. Rogers and Deputy Kenny Corrill pursuant to 42 U.S.C. § 1983, claiming deprivation of his Eighth Amendment rights. Schoonover argues that he faced a substantial risk of harm from Waters, a violent inmate who harbored animosity against sex offenders such as him, yet Corrill moved him into an overcrowded cell with Waters and failed to intervene as the assault occurred. He also alleges that Rogers facilitated Corrill's actions by permitting chronic overcrowding at the jail and failing to adopt a classification system that would segregate sex offenders from inmates such as Waters. The district court granted summary judgment to Rogers and Corrill, reasoning that Schoonover had failed to present evidence that would allow a reasonable jury to find for him on these claims.

We do not minimize the seriousness of this attack or the extent of Schoonover's injuries. Nevertheless, our inquiry under the Eighth Amendment centers on whether Corrill and Rogers exhibited "deliberate indifference," that is, whether they "acted or failed to act despite [their] knowledge of a substantial risk of serious harm" to Schoonover. *Farmer v. Brennan*, 511 U.S. 825, 841–42 (1994). Schoonover did not present evidence that Corrill knew that Waters posed a particular danger of serious harm to sex offenders, or that Rogers's actions and policies demonstrated disregard of Schoonover's Eighth Amendment rights. We therefore affirm the district court's grant of summary judgment.

## I.  BACKGROUND

In April 2016, the Adams County Jail (the Jail) was chronically overcrowded; its nine cells, which had a capacity of 38 inmates, routinely held over 60 individuals. Sheriff Rogers was responsible for overseeing the Jail, and he recognized the overcrowding issue. At various times, he attempted to mitigate the problem by transferring inmates to other county jails throughout Ohio, discussing the issue with county commissioners, opening a workhouse, and seeking alternatives to incarceration for some categories of offenders.

One or two deputies were responsible for monitoring inmates during each shift. The deputies would also distribute meals, medicines, and cleaning supplies; assist in transporting inmates to court; and conduct cell checks approximately every hour. These activities provided several opportunities for the officers to view inmates. During a cell check, for instance, a deputy would look from a window in the cell door or look in from a catwalk next to the bars, which offered a view of the entire cell. When distributing meals, officers would either pass food through a slot in the door or open the door to distribute trays of food—in either case, verifying that each inmate received a meal. When deputies were not patrolling the cell block or assisting with other tasks,

they would monitor cells from a station with a live video feed of all the cells. These cameras were positioned to capture most of the area within each cell but did not reach the cells' shower or toilet areas.

The Jail lacked a formal system for classifying incoming inmates according to their offenses and likelihood of violence. However, officers followed an informal practice of segregating sex offenders from the general jail population, in part on the belief that such inmates were more vulnerable to attacks. In particular, sex offenders were housed in one of the four-person cells, called "End 4" and "Middle 4," when possible.

Brendon Schoonover entered the Jail on April 4, 2016 to begin a 90-day sentence for criminal damaging, in violation of Ohio Revised Code § 2909.06. He had previously been convicted of sexual battery, in violation of Ohio Revised Code § 2907.03(B), in 2005, for which he was sentenced to a six-month residential sex-offender treatment program, along with five years of community control and a requirement to register as a sex offender for ten years. He had also served several sentences for failing to register as a sex offender, failing to notify the sheriff of a change of address, and charges unrelated to his sex-offender status. Although by 2016 he was no longer required to register, and the Jail's intake officers may not have checked criminal histories in practice, the officers were able to access his criminal history. The Jail administrator at the time, Lt. Micah Poe, also testified during his deposition that he and at least some other officers were aware of Schoonover's prior sex offense.

An intake officer initially assigned Schoonover to the Middle 4 cell—one of the locations where the Jail usually placed sex offenders on an informal basis. The following day, April 5, Schoonover was transferred to the Shelby County Jail, where he remained until he was moved back to the Adams County Jail on May 8. Upon his return, Corrections Officer Kate Arnold

assigned him to the End 4 cell, which the Jail also frequently used to house sex offenders. She then moved him to the Middle 4 cell five days later.

Clinton Waters was also housed in Middle 4. Several days earlier, Deputy Corrill had witnessed Waters hitting an inmate. And, while housed in Middle 4 with Schoonover on May 13, Waters assaulted another inmate, Mike Sapp, after learning that he was a sex offender. According to Waters, before the assault began, Sapp had informed Corrill that he believed his life was in danger, but Corrill did not permit him to leave the cell. Notwithstanding this incident, no violence occurred between Waters and Schoonover for five days while they were housed together in Middle 4.

On May 18, Corrill moved Schoonover and Waters to the "Middle 8" cell, an eight-bunk unit that the Jail usually used for general-population inmates. The reason for the transfers is unclear from the jail's shift log, which tautologically states that Schoonover and Waters were moved to the Middle 8 "with a movement reason of MOVEMENT." *See* R. 47-14, Pl.'s Ex. 6, PID 658. But other evidence indicates that the male residents of Middle 4 likely were moved to different locations in order to make space for a group of female inmates that had fought in the early hours of the morning (although Schoonover disputes this reason). Schoonover and Waters joined 11 other inmates in the cell, and because there were fewer bunks than people, Schoonover received a mat, which he placed near the cell's phone. The inmates received lunch around noon without incident.

At this point in the story, the parties' accounts begin to diverge. According to Schoonover, soon after he arrived in Middle 8 cell, Steven Sturgill—one of the other inmates—began to talk on the phone and received information that led him to conclude that Schoonover had committed a sex offense against a younger female relative. Sturgill then woke up Waters to tell him that Schoonover

was a "sex offender" and a "child molester." R. 47-1, Schoonover Dep., PID 204–05. Waters moved Schoonover's mat near the toilet, urinated on him, and kicked him in the face. Over the next eight hours, Waters and other inmates proceeded to beat Schoonover in "spurts." R. 47-6, Doss Dep., PID 364. They repeatedly instructed him to go into the shower to wash off his blood and conceal himself from officers, and hit him while he was in the shower, eventually breaking his jaw. At one point, after Schoonover exited the shower, Waters jumped from a table onto his ribs, fracturing several. At another, Waters slammed the lid of a plastic box over his head and then sprayed cleaning supplies into the open wound.

In Rogers's and Corrill's version of events, however, the beating occurred later in the day, and the bulk of the violence occurred *after* Corrill's shift had ended at 6:00 p.m. They further emphasize that Schoonover's attackers took several steps to conceal their actions, such as pausing when they heard an officer approach, forcing Schoonover to enter the shower before officers entered the cell to escort other inmates to visits, and confining most of their actions to the shower and toilet areas, where security cameras would not detect them.

The parties also present differing views on two other factual issues. First, Appellees say that Rogers was not working at the Jail at the time of the attack, although Schoonover notes that several deponents testified that they might have seen him on that day. Second, Appellees stress that Schoonover attempted "not to make much noise" as the beating occurred. R. 47-1, Schoonover Dep., PID 232. But Schoonover points to testimony that he screamed and Waters shouted during the violence, and that the attack could be heard by other inmates.

In any event, the parties agree that no officer responded to the attack until Officer Arnold began her shift and an inmate in a neighboring cell passed her a note informing her of the beating. Arnold and additional officers removed Schoonover from the Middle 8 cell at approximately 7:40

p.m. He was transported first to the Adams County Regional Medical Center and then to the University of Cincinnati Medical Center, where he was treated for jaw fractures, two fractured ribs, and other injuries. Rogers instructed a detective to conduct a criminal investigation of the incident but did not investigate jail personnel. The investigation ultimately resulted in assault charges and convictions for Waters and two other inmates.

On May 2, 2018, Schoonover filed a complaint against Rogers, Corrill, and other officers in the Adams County Sheriff's Office pursuant to 42 U.S.C. § 1983, arguing that the defendants violated his rights under the Due Process Clause of the Fourteenth Amendment. Schoonover then voluntarily dismissed all defendants except Rogers and Corrill. After discovery, Rogers and Corrill moved for summary judgment, arguing that Schoonover had improperly brought his claims under the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment, and that, regardless, he had failed to establish entitlement to relief even under the proper standard. Schoonover opposed the motion. After a hearing, the district court granted summary judgment to Rogers and Corrill on Schoonover's claims, which it analyzed under the Eighth Amendment.

Schoonover timely appealed. We have jurisdiction over the district court's final order pursuant to 28 U.S.C. § 1291.

## II. ANALYSIS

### A. Legal Framework

We review a district court's grant of summary judgment de novo. *Slusher v. Carson*, 540 F.3d 449, 453 (6th Cir. 2008). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one "that might affect the outcome of the suit under the governing law," and a "genuine" dispute is one in which, given the evidence, "a reasonable jury

could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In resisting a summary-judgment motion, the nonmoving party must point to specific facts indicating a genuine dispute; nonetheless, "we view the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in that party's favor." *Slusher*, 540 F.3d at 453.

Schoonover brings § 1983 claims against both Rogers and Corrill in their personal capacities, and he also sues Rogers in his official capacity. Section 1983 affords relief where a person acting under color of state law deprives a plaintiff of a right secured by the Constitution or federal law. *See Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006). Here, though Schoonover initially cited the Fourteenth Amendment, the district court properly concluded that he brought his claims pursuant to the Eighth Amendment, which recognizes that prison officials have a duty to protect inmates from violence inflicted by other inmates as part of its prohibition on "cruel and unusual punishments." U.S. Const. amend. VIII; *see Farmer*, 511 U.S. at 833.[1]

"[T]he Constitution does not mandate comfortable prisons," but the Eighth Amendment proscribes acts of prison officials that "involve the wanton and unnecessary infliction of pain" or are "grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981). In the context of claims involving a failure to prevent violence by other prisoners or a denial of medical care, a two-part test determines whether a prison

---

[1] The Fourteenth Amendment protects pretrial detainees under a framework that is similar to that of the Eighth Amendment. *See Burwell v. City of Lansing*, 7 F.4th 456, 463 (6th Cir. 2021). After the Supreme Court held in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), that an officer violates a pretrial detainee's Fourteenth Amendment rights if the officer uses force in an objectively unreasonable manner, some panels of this court have modified the subjective component of the standard for deliberate-indifference claims. *Compare Brawner v. Scott County*, 14 F.4th 585, 596–97 (6th Cir. 2021), *with Trozzi v. Lake County*, 29 F.4th 745, 753 (6th Cir. 2022). We need not wade into this issue, however, because Schoonover was not a pretrial detainee, and his claims fall squarely within the ambit of the Eighth Amendment.

official has violated the Eighth Amendment. First, the prisoner must have faced a substantial risk of a harm, which "must be, objectively, sufficiently serious." *Farmer*, 511 U.S. at 834 (quotation marks omitted). Second, the prison official must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and the official must have drawn that inference and nonetheless disregarded the risk "by failing to take reasonable measures to abate it," a standard known as "deliberate indifference." *Id.* at 837, 847; *see also Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).[2] While the deliberate-indifference inquiry thus requires a plaintiff to prove an official's "subjective knowledge," courts may consider circumstantial evidence indicating that the official strongly suspected that a risk was present but avoided further investigation. *Comstock*, 273 F.3d at 703. In short, proof that a prison official was merely negligent is insufficient; deliberate indifference requires a state of mind akin to criminal recklessness. *See Reilly v. Vadlamudi*, 680 F.3d 617, 627 (6th Cir. 2012).

Since this court assesses the liability of each defendant individually, *see Bishop v. Hackel*, 636 F.3d 757, 767 (6th Cir. 2011), we begin with the claim against Corrill, and then proceed to the claims against Rogers in his personal and official capacities, respectively.[3]

---

[2] This court has occasionally considered whether a defendant recklessly disregarded a risk of harm to be a separate inquiry from whether the defendant reasonably responded to the risk. *See Beck v. Hamblen County*, 969 F.3d 592, 600 (6th Cir. 2020). It makes little difference in this case whether *Farmer* set out a two-part or three-part test, because the deliberate-indifference inquiry overlaps with the inquiry into the reasonableness of Corrill's and Rogers's actions.

[3] Appellees also raised a qualified-immunity defense in their Answer, but they failed to develop that argument in their Motion for Summary Judgment or on appeal. A party generally forfeits an argument by failing to raise it on appeal or by raising it in a cursory manner. *See S.H.A.R.K. v. Metro Parks Serving Summit Cnty.*, 499 F.3d 553, 564–65 (6th Cir. 2007). Appellees therefore forfeited this argument. Moreover, even if we were to conduct a qualified-immunity analysis, the outcome in this case would remain the same. Officers invoking qualified immunity are not liable if "their conduct does not violate clearly established statutory or constitutional rights," and Schoonover has not shown that either Corrill or Rogers deprived him of his Eighth Amendment rights—whether clearly established or not. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

## B. Claim Against Deputy Corrill

Schoonover presents two theories in support of his Eighth Amendment claim against Corrill. First, he asserts that Corrill was aware of the substantial risk of harm that he would face as a sex offender if placed in a cell with Waters, who was violent and targeted sex offenders, and that Corrill recklessly failed to protect him from that danger. Second, he claims that Corrill was deliberately indifferent during the attack, because Corrill monitored video feeds, conducted rounds through the Jail, and distributed meals to the inmates without intervening to stop the hours-long violence. Regarding the failure-to-protect theory, the district court held that Schoonover failed to present a genuine issue as to whether Corrill was aware of a heightened risk of harm needed to establish deliberate indifference because, among other things, no reasonable jury could find that Corrill knew that *other inmates* knew that Schoonover was a sex offender. *See Schoonover v. Rogers*, 2021 WL 4479354, at \*9 (S.D. Ohio Sept. 30, 2021). The court also held that Schoonover did not identify evidence showing that Corrill learned about and failed to intervene to stop the attack as it was occurring. *Id.* at \*10. We conclude that the court properly granted summary judgment to Corrill on both theories.

### 1. Failure-to-Protect Theory

Schoonover argues that he has raised a genuine issue about whether Corrill knew that he faced a danger of serious harm. Implicitly, he also challenges the court's characterization of the evidence necessary to show that Corrill was aware of this heightened risk: According to Schoonover, the mere fact that Waters was known to attack sex offenders, combined with Schoonover's own history, would suffice to make Corrill aware that Schoonover faced a substantial risk of an attack regardless of whether Corrill knew that other inmates knew that Schoonover was a sex offender. We do not need to decide whether Schoonover had to produce

evidence that Corrill knew that Waters knew about Schoonover's sex-offender status; regardless, summary judgment was proper because Schoonover failed to produce enough evidence for a reasonable jury to find that Corrill knew that Waters posed a particular threat to toward sex offenders.

At the outset, we note that, as with the parties and the district court, our analysis focuses on the subjective requirement of the Eighth Amendment standard, rather than the objective requirement. After all, this court has repeatedly observed that the risk of violent attack by fellow prisoners known to have previously committed serious assaults, absent precautions, can create a substantial risk of serious harm. *See Richko v. Wayne County*, 819 F.3d 907, 916 (6th Cir. 2016) (holding that the risk of assault from a violent, mentally disturbed cellmate satisfied the objective requirement); *Young v. Campbell County*, 846 F. App'x 314, 321 (6th Cir. 2021) (holding that the evidence of a violent inmate's attack that occurred after a prison failed to reclassify him satisfied the objective inquiry). Granted, a plaintiff does not face this risk because of *any* likelihood of prison violence; there must be a causal link between an officer's actions and the resulting substantial risk of harm. *See Thompson v. County of Medina*, 29 F.3d 238, 242 (6th Cir. 1994). But taking the evidence in the light most favorable to Schoonover, he has identified that link here. He indicated that sex offenders were vulnerable to attack at the Jail from other inmates; one officer, for instance, estimated during a deposition that half of the fights at the Jail would involve sex offenders, because other inmates would attack a sex offender "[j]ust because he was one." R. 47-12, Arnold Dep., PID 552. Schoonover also pointed to evidence showing that sex offenders faced a particular risk from Waters (regardless of whether officers knew about this risk), as Waters had participated in several fights and previously attacked sex offenders, including one victim just days

before the attack on Schoonover. A reasonable jury could find that this combination of factors created a substantial risk of serious harm to inmates such as Schoonover.

A reasonable jury, however, could not find that Corrill acted with deliberate indifference. Even if Corrill was aware of Schoonover's sex-offender status, the fact that sex offenders are more vulnerable than other inmates to attacks in general would not alone amount to knowledge of a substantial risk of serious harm. A general vulnerability to attack is normally insufficient for an Eighth Amendment claim; rather, an officer must know about an inmate's "*specific* situation." *Beck v. Hamblen County*, 969 F.3d 592, 601 (6th Cir. 2020); *see also Dale v. Poston*, 548 F.3d 563, 569–70 (7th Cir. 2008) (explaining that the "inherent risks faced by snitches in prison" did not mean that an officer was deliberately indifferent when the officer knew that an inmate was an informant).

We have recognized that, in some situations, a showing that a would-be attacker poses a *specific* danger to a particular plaintiff suffices to make an officer aware of a substantial risk of harm. An officer can be aware of a substantial risk when specific indicia show that an inmate with a history of attacks is likely to be violent again in the near future. *See Richko*, 819 F.3d at 918 (concluding that an officer could be aware of risk to an inmate from a cellmate with a history of violence, bipolar disorder, and schizophrenia who had not been taking medications for several days); *see also Young v. Selk*, 508 F.3d 868, 873–74 (8th Cir. 2007) (concluding that officers were aware of the substantial risk that an inmate faced from a "dangerous man who was particularly volatile" when the inmate informed the officers about receiving threats from the man, but they had ignored that risk). Here, though sex offenders faced a generalized risk of violence in the Jail, Waters's own deposition testimony indicates that he was especially violent and held animosity specifically against sex offenders.

Sometimes, a plaintiff may belong to "a class of prisoners *particularly* vulnerable to assault." *Reedy v. West*, 988 F.3d 907, 915 (6th Cir. 2021) (emphasis added). We have recognized several examples of particularly vulnerable prisoners, including a prisoner undergoing gender-conversion therapy who "displayed female characteristics, including developed breasts and a feminine demeanor," *Greene v. Bowles*, 361 F.3d 290, 293–94 (6th Cir. 2004), or a prisoner who was "particularly vulnerable to sexual assault" because he was young, small, and "had a history of mental illness," *Bishop*, 636 F.3d at 771; *accord Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 84 (6th Cir. 1995) ("smaller, youthful prisoners" who were housed in an environment of widespread sexual assaults). In determining whether a prisoner belongs to a particularly vulnerable group, we have also given weight to evidence that prison officials acknowledged the risk of harm faced by members of that group. *See, e.g.*, *Bishop*, 636 F.3d at 771 (relying on defendant's testimony about awareness of sexual predators in unit); *Greene*, 361 F.3d at 292 (noting that defendants had placed transgender plaintiff in protective custody unit in men's prison because of the person's gender identity); *Taylor*, 69 F.3d at 82 (relying on defendant's testimony in earlier case). Still, in situations involving personal characteristics that made the prisoner "particularly vulnerable," the plaintiff must show that the officer knew that his placement with another inmate or in a certain cell would lead to a substantial risk of harm. *See Bishop*, 636 F.3d at 768 (stating that the plaintiff must establish "knowledge of a risk to his safety because of his status as a vulnerable inmate and [the assaulter's] status as a predatory inmate").

Taken together, then, these decisions dictate the facts that Schoonover must prove to establish deliberate indifference by Corrill. One relevant fact is that Schoonover is a member of a class of individuals particularly vulnerable to assaults. *See, e.g.*, *Reedy*, 988 F.3d at 915. Here, that means that Schoonover must present enough evidence to allow a reasonable jury to find that Corrill

knew that sex offenders were particularly vulnerable at the Jail and that Schoonover was a sex offender. Schoonover must also offer evidence indicating that Corrill was aware that Waters was especially likely to assault individuals in the vulnerable group, whether because of past incidents of violence, threats, or other indicia. *See, e.g.*, *Richko*, 819 F.3d at 918.

The district court, for its part, reasoned that because an inmate's sex-offender status is not obvious on its face, an official is aware of a substantial risk to a sex offender only if the official knows *that other inmates know* about the prior sex offense. *See Schoonover*, 2021 WL 4479354, at *9. We need not decide, however, whether this additional knowledge is necessary to a showing of deliberate indifference.

Regardless of whether Corrill knew that other inmates in Middle 8 knew that Schoonover was a sex offender, Corrill is entitled to summary judgment. Schoonover's past sex offense may well have placed him in a particularly vulnerable group, one that the Jail recognized by attempting to segregate sex offenders from the general population whenever possible. Waters also states that just days before his incident with Schoonover, he had assaulted another inmate, Michael Sapp, because Sapp was a sex offender. Yet, though Schoonover presents some evidence that Corrill was aware that the Sapp assault occurred, he does not muster any evidence that Corrill was aware of the reason for the attack—let alone that the same reason would also prompt Waters to assault Schoonover, with whom Waters had been housed for several days. In fact, no specific evidence even indicates that Corrill knew that Waters was prone to attacking sex offenders. And, though Poe testified that Waters was a troublesome "frequent flyer" at the Jail, neither he nor the other officers indicated that they were aware, at the time of the attack, that Waters was particularly violent, let alone that he targeted sex offenders. On this record, then, there is at most only a "scintilla of evidence" that Corrill knew that Waters was particularly violent towards sex

offenders. *See Reedy*, 988 F.3d at 916 (quoting *Anderson*, 477 U.S. at 252). That is not enough for a reasonable jury to find that Corrill was aware of the specific risk that Waters posed to inmates like Schoonover. The district court therefore properly granted summary judgment to Corrill.

### 2. *Failure-to-Intervene Theory*

Schoonover also failed to show that Corrill's failure to intervene during the assault demonstrated deliberate indifference. The parties dispute both the timeline of the assault and its overlap with Corrill's shift. In the light most favorable to Schoonover, the story is that sporadic violence was underway when Corrill distributed dinner; that he had the ability to see some portions of the cell on the video monitor; and that the assault could be heard from various locations in the Jail, although perhaps not on the first floor where the guards are stationed. At the same time, it is not seriously disputed that Waters and the other inmates conducted most of their actions out of range of the cameras; that they forced Schoonover to enter the shower when a deputy was nearby; that they paused their actions when they suspected that a guard was approaching; that Schoonover did not ask for aid; and that he may have attempted to hide the injured portion of his face when Corrill passed out dinner.

Taken together, this evidence suggests that Corrill may have had opportunities to view the assault and Schoonover's injuries, but not that he actually witnessed anything. Of course, a prison official "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true." *Farmer*, 511 U.S. at 843 n.8. For instance, when a plaintiff presents evidence that an officer could hear an assault, we have declined to grant summary judgment, even if the officer denies noticing the noises. *See Richko*, 819 F.3d at 919–20. At the same time, "an ability to see [an inmate] is not the same as actually seeing him in distress." *Burwell*, 7 F.4th at 467. Thus, even when officers had a duty to monitor video screens, their failure

to do so—or their failure to conclude from unclear footage that an inmate required aid—may indicate negligence, but likely will not alone show deliberate indifference. *See id.* at 467–68. The fact that Corrill's duties included monitoring the video screens and conducting cell checks thus does not show deliberate indifference, absent further evidence that because of these duties he "dr[e]w the inference" that Schoonover's assault and injuries were occurring. *Farmer*, 511 U.S. at 837.

Compare Corrill's actions to those of a defendant in *Young v. Campbell County*. There, a deputy conducted seven "observation scans," twice passed out meals, and completed one face-to-face headcount; the plaintiff, who had been assaulted by his cellmates and sported a black eye and a limp, did not speak to any jail employee during this period. 846 F. App'x at 326–27. We explained that there was no genuine dispute that the deputy was unaware of the plaintiff's injuries during the scans and the meal passes; only during the headcount, when he was face to face with inmates, was there evidence that he would have noticed the injuries sufficient to defeat summary judgment. *Id.* at 327.

Here, Corrill was closest to Schoonover when he distributed the dinner trays. But a cellmate, Brian Young, testified in a deposition that Schoonover turned his head away from Corrill when receiving his meal so that his facial injuries would not be visible and did not ask for aid. That evidence shows that Corrill may have had an opportunity to learn of the assault as it was occurring, but not that he did so. Taken as a whole, then, Schoonover has not carried his burden to "present some 'specific facts showing that there is a genuine issue for trial.'" *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010) (quoting *Anderson*, 477 U.S. at 248). As such, the evidence falls below the threshold that we accepted in *Young*. We therefore affirm the grant of summary judgment for Corrill on both the failure-to-protect and failure-to-intervene theories of liability.

### C. Claim Against Sheriff Rogers in His Personal Capacity

Schoonover next argues that the district court erred in granting summary judgment to Rogers in his personal capacity. In particular, he contends that a reasonable jury could find that Rogers acted with deliberate indifference, because (1) he knew of persistent overcrowding at the Jail but permitted it to continue, even when alternatives to mitigate overcrowding were available, and (2) he was aware of the particular dangers faced by sex offenders at the Jail but did not adopt a formal inmate-classification system that would have ensured that Schoonover was segregated from the general population. According to Schoonover, the combination of overcrowding and the absence of a classification system increased the likelihood that sex offenders, such as he, would suffer violence at the hands of other inmates.

Beginning with the Eighth Amendment's objective requirement, it is not clear to us that overcrowding and classification failures produced a sufficient risk of serious harm to Schoonover. Overcrowding, on its own, does not amount to cruel and unusual punishment. *See Rhodes*, 452 U.S. at 348; *Agramonte v. Shartle*, 491 F. App'x 557, 560 (6th Cir. 2012). Similarly, the absence of a formal classification system does not present a substantial risk of harm unless there is a "causal link" between a harm (such as an assault) and the classification system. *Thompson*, 29 F.3d at 242.

To be fair, Schoonover musters some evidence indicating that the combination of the overcrowded conditions, classification problems, and likelihood of violence to sex offenders produced a specific risk of harm to him. In depositions, jail officials admitted that more assaults occurred when the prison population exceeded its 38-person capacity, and that sex offenders were especially likely to be victims of prison violence. And Rogers recognized this situation and attempted to segregate sex offenders from the general population, albeit on an informal basis.

In the end, we need not decide whether Schoonover has satisfied the objective inquiry because, though these considerations may muddy the objective inquiry, they clarify the subjective one. For if Rogers knew about the risk faced by sex offenders in an overcrowded prison, the evidence indicates that he did not deliberately disregard that risk; rather, he took steps to abate it. Rogers testified that he discussed the overcrowding problem with county commissioners, that jail staff periodically moved inmates to jails in other counties,[4] and that staff would usually attempt to segregate sex offenders. Therefore, rather than disregarding the risk to the safety of sex offenders, Rogers recognized that risk and made "*some* efforts to abate this general risk of inmate-on-inmate violence." *Beck*, 969 F.3d at 601 (quotation marks omitted).

Rogers's options were limited: He neither controlled the resources available for new facilities nor the inflow of inmates. *See id.* at 601–02. In this context, the lack of a formal classification system may also have been an unwise or even unreasonable policy decision. But it does not indicate that Rogers *disregarded* a substantial risk to inmates, given the evidence about the other steps that he took. Rogers's potentially imperfect policy decisions do not demonstrate deliberate indifference.

Nor can Schoonover's Eighth Amendment claim succeed even if he argues that Rogers was deliberately indifferent when it came to the specifics of Waters's attack. Assuming that Rogers was at the Jail on the date of the assault (a point that the parties dispute), a supervisor is not liable under § 1983 unless he either encouraged a subordinate's specific acts of misconduct or directly

---

[4] Schoonover points out that Rogers's failure to ensure that inmates were consistently moved to other county jails may violate Ohio Revised Code § 341.12, which states that a county sheriff whose county lacks "sufficient jail or staff . . . shall convey" inmates to jails in other counties. As the district court recognized, this state-law question is distinct from the Eighth Amendment analysis, because overcrowding is significant in the latter context only insofar as it is causally connected to a separate serious harm or substantial risk of such harm. *See Schoonover*, 2021 WL 4479354, at *11.

participated in them, and there is no evidence showing that Rogers encouraged or participated in the acts that led to Schoonover's injuries. *See Phillips v. Roane County*, 534 F.3d 531, 543 (6th Cir. 2008). In short, there is insufficient evidence that Rogers participated in any of the actions that could give rise to liability: failing to segregate Schoonover or Waters, placing the two inmates together in Middle 8, or disregarding the assault as it occurred. The district court properly granted summary judgment to Rogers on the claim against him in his personal capacity.

### D.  Claim Against Sheriff Rogers in His Official Capacity

Finally, Schoonover contends that the district court erred in granting summary judgment to his claim against Rogers in his official capacity. But the court did not err on this claim, either, because it correctly held that there was no genuine issue about whether a municipal policy caused an Eighth Amendment violation.

We usually treat claims against officers in their official capacities as claims against the government entities that the officers represent. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). A municipality does not incur § 1983 liability merely because it employed officials who violated a plaintiff's constitutional rights. Instead, the plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (emphasis omitted)). Consequently, Schoonover can succeed on his official-capacity claim only if a "policy or custom" at the Adams County Jail caused the violation of his constitutional rights. *Monell*, 436 U.S. at 694. We have recognized four types of policy or custom that potentially qualify: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of

a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

Schoonover argues that Rogers, acting as the final policymaker for the administration of the Jail, failed to implement a formal classification system or limit overcrowding, tolerated his subordinates' transfers of sex offenders like Schoonover into cells where they were likely to be attacked, and ratified those illegal actions by failing to investigate or discipline the subordinates. These arguments are unavailing because, as explained above, he has not established that he was deprived of a constitutional right. Furthermore, none of his arguments succeed even if we assume for the sake of argument that he has suffered an Eighth Amendment injury.

Schoonover has not identified an illegal policy that Adams County "has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Under Ohio law, Sheriff Rogers has final policymaking authority over jail operations, *see Orr v. Trumbull County*, 77 F. Supp. 2d 853, 857 (N.D. Ohio 1999) (discussing Ohio Rev. Code § 307.021(A)), so his decisions as to those operations can likely constitute an official policy for the purposes of municipal liability, *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988) (explaining that "identification of policymaking officials is a question of state law"). But Rogers did not direct deputies to maintain overcrowded facilities or house sex offenders with potential attackers. Rather, the evidence indicates that he attempted to periodically move inmates to other county jails during some periods of overcrowding, and that the jail staff followed an informal practice of segregating sex offenders from the general population.

True, Rogers did not implement a formal classification policy, and the Jail was often overcrowded. And some courts have considered that "a conscious decision not to take action" can sometimes lead to municipal liability. *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir.

2017). Still, the absence of a formal classification system is not a constitutional violation—even if it is unwise as a matter of carceral management—unless there is a causal link between that absence and a plaintiff's harm. *See Thompson*, 29 F.3d at 242. That connection is missing here. Schoonover was initially placed in cells that were often (if unofficially) reserved for sex offenders as part of the Jail's informal practice. In fact, Lt. Poe, the administrator of the Jail at the time, testified that he had only approved moving sex offenders into a general-population cell a handful of times, and that in each instance, the inmate had requested the move. Schoonover was not injured until Corrill nonetheless moved him to the Middle 8 cell in a manner that differed from these practices. The record also indicates that Rogers repeatedly sought to mitigate the overcrowded conditions but was hampered by budgetary and other resource-related constraints. In other words, the harms that Schoonover suffered were linked to acts that occurred independently from the Jail's general practices, not as a result of its policies or customs.

Rogers's actions also do not indicate that he routinely tolerated a practice of permitting sex offenders to be housed in overcrowded cells with inmates likely to attack them. Schoonover points to several violent incidents that occurred shortly before his attack, including some that involved sex-offender victims. But the mere fact that attacks against sex offenders occurred in overcrowded cells did not mean that these circumstances were officially tolerated, particularly in light of Rogers's efforts to combat overcrowding and to segregate sex offenders.

Schoonover's ratification theory has additional defects. To begin with, he likely could not raise this theory at the summary-judgment stage, since he did not raise it in his Complaint. *See Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005). Even if the ratification theory were construed as part of a deliberate-indifference claim against Rogers in his official capacity (which does appear in the Complaint), it would fail on the merits. Rogers

ordered an investigation of the attack, albeit one that focused on the other inmates rather than the officers on duty. That approach may have been insufficient to change subordinates' practices *after* Schoonover was harmed, but Schoonover does not indicate whether other incidents occurred *before* his attack in which a sex offender was assaulted and Rogers neither adequately investigated nor disciplined the officers on duty. *See Wright v. City of Euclid*, 962 F.3d 852, 882 (6th Cir. 2020) (noting that a defendant's failure to investigate subsequent, similar incidents after the plaintiff suffered injuries would not suffice to demonstrate ratification). Schoonover does not present additional evidence that investigations into past attacks either involved officer misconduct or resulted in the inadequate discipline. His only reference to any investigation concerns the proceedings related to his attack, and these post hoc actions do not demonstrate that ratification was causally linked to his injuries.

Therefore, because none of Schoonover's theories of municipal liability succeed, the district court properly granted summary judgment to Rogers in his official capacity.

## III.  CONCLUSION

To resist the motion for summary judgment on his Eighth Amendment claims, Schoonover needed to adduce evidence that created a genuine issue about whether Corrill and Rogers were aware that he faced a substantial risk of serious harm but disregarded that risk. For the foregoing reasons, he failed to do so. We therefore AFFIRM the district court's grant of summary judgment.